**In re the Marriage of Debora MacMillan NEWMAN, Petitioner,**

v.

**Richard Wenrick NEWMAN, Respondent.**

**Richard Wenrick NEWMAN, Petitioner,**

v.

**Debora MacMillan NEWMAN, Respondent.**

**Nos. 80SC169, 80SC174.**

Supreme Court of Colorado, En Banc.

Nov. 1, 1982.

Shaw, Spangler & Roth, Stan L. Spangler, Timothy E. Whitsitt, Edward C. Moss, Denver, for Debora MacMillan Newman.

Wolf & Slatkin P.C., Jonathan L. Madison, Albert B. Wolf, Denver, for Richard Wenrick Newman.

LEE, Justice.

We granted certiorari to review the decision of the court of appeals in *In Re the Marriage of Debora MacMillan Newman and Richard Wenrick Newman*, 44 Colo. App. 307, 616 P.2d 982 (1980). We affirm in part and reverse in part. The issue on appeal is the validity and enforceability of an antenuptial agreement executed by the husband and wife the day before they were married in 1975. The wife petitioned for dissolution in 1977, after thirty months of marriage.

The record establishes that both parties had been previously married and divorced. Because of financial difficulties that had arisen in the previous divorces, especially for the husband, a man of considerable means, the parties agreed to execute an antenuptial agreement fixing their property rights in the event their marriage should fail. The terms of the agreement were suggested by the wife at a meeting with the husband and his attorney. The attorney acted only as scrivener and did not advise the wife regarding her interests. Although given an opportunity to obtain independent counsel, the wife signed the agreement without having done so.

The terms of the agreement provided that upon dissolution the wife would receive the car she was then driving, any gifts given to her by her husband, all of her separately owned property at the time of the marriage, $2,000 in cash, and one-half of the balance, if any, of a joint savings account into which all of her earnings during the marriage were to be deposited. The agreement allowed the wife no maintenance or other property division, unless she were at the time of the divorce disabled, in which case she would be entitled to receive payment of $500 per month from the husband.

The wife's dissolution petition requested maintenance, property division, attorney's fees, and costs. The husband contended that the antenuptial agreement controlled all rights on dissolution. The trial court granted the dissolution, upholding the antenuptial agreement, and denying the wife maintenance or further property settlement. The court of appeals affirmed as to the property division but refused to honor the provision denying maintenance, holding that such a provision was void as against public policy. Both parties sought further

review on petition for certiorari. We granted both petitions and address the arguments made by the parties.

### I.

The wife argues that an antenuptial agreement providing for a division of property should a divorce take place is void as against public policy because such an agreement tends to promote dissolution of the marriage. She relies on the case of *Estate of Duncan,* 87 Colo. 149, 285 P. 757 (1930), where this court voided an antenuptial agreement which provided that the husband would be entitled to a divorce at any time so long as he paid his wife $100 for each year of marriage. The agreement further provided that the wife would then leave his house without complaint within twenty-four hours. The court found that the antenuptial agreement made the marriage a sham and therefore was void. The *Duncan* decision remains valid on its facts, but does not control the disposition of the instant case. The law of marriage and the grounds for dissolution in Colorado have been altered in the more than fifty years since announcement of the decision in *Duncan.*

The State of Colorado has an interest in marriage, and marriage is favored over less formalized relationships which exist without the benefit of marriage. *In Re Marriage of Franks,* 189 Colo. 499, 542 P.2d 845 (1975); *Moats v. Moats,* 168 Colo. 120, 450 P.2d 64 (1969). Undeniably, some marriages would not come about if antenuptial agreements were not available. This may be increasingly true due to the frequency of marriage dissolutions in our society, and the fact that many people marry more than once.

■ This court has not previously decided the question whether an antenuptial agreement freely executed by the parties and providing for terms of separation should the marriage fail is void as against public policy.[1] Nevertheless, antenuptial agreements have generally been upheld in

this state. This court implicitly recognized the validity of antenuptial agreements in a dissolution proceeding in the case of *In Re Marriage of Franks, supra.* Subsequently, our court of appeals expressly upheld the validity of an antenuptial agreement in a marriage terminated by dissolution. *In Re Marriage of Ingels,* 42 Colo.App. 245, 596 P.2d 1211 (1979). This court has recognized as valid antenuptial contracts dealing with property division on the death of one of the spouses, when made after full and fair disclosure and absent fraud and overreaching. *In Re Estate of Lopata,* 641 P.2d 952 (Colo. 1982); *Estate of Stever,* 155 Colo. 1, 392 P.2d 286 (1964); *Remington v. Remington,* 69 Colo. 206, 193 P. 550 (1920). We are not persuaded of any reasonable basis to conclude that agreements dealing with property division on dissolution should be regarded as less valid than those which provide for property division on death so long as the same stringent tests for validity of such antenuptial agreements are met. *See Posner v. Posner,* 233 So.2d 381 (Fla.1970); *Del Vecchio v. Del Vecchio,* 143 So.2d 17 (Fla. 1962).

The legislative statement of policy in the Uniform Dissolution of Marriage Act (Act) supports the amicable settlement of disputes which arise within a marriage. Section 14–10–102(2)(a), C.R.S.1973. Although the state has an interest in marriage and in preserving family relationships, the public policy of this state has altered dramatically in regard to marriage and divorce. *In Re Marriage of Franks, supra.* This is evident from the Act, which allows for dissolution of marriage on grounds of irretrievable breakdown of the relationship. An unhappy partner in marriage now has the right to singly petition for dissolution of the marriage, and although the other marital partner may contest the breakdown of the marriage, if the court finds irretrievable breakdown, one partner acting alone may precipitate the termination of the marriage. Thus dissolution may be obtained with relative

1. Although antenuptial agreements in other cases have addressed maintenance and property division in case of a separation, we have not

previously been required to directly decide this issue. *See e.g., In re Marriage of Franks, infra.*

ease. We cannot say that public policy expressed in the Act is eroded by agreements which anticipate and provide for the economic arrangements upon dissolution of a marriage.[2] On the contrary, it is reasonable to believe that such planning brings a greater stability to the marriage relation by protecting the financial expectations of the parties, and does not necessarily encourage or contribute to dissolution.[3] In our view, it is unlikely that an otherwise viable marriage would be destroyed because of the potential for economic gain through enforcement of the terms of the antenuptial agreement. Thus, we reject the contention urged by the wife that such agreements violate public policy and are void *ab initio* in Colorado.[4] *See Posner, supra; Buettner v. Buettner,* 89 Nev. 39, 505 P.2d 600 (1973); *In Re Borton's Estate,* 393 P.2d 808 (Wyo. 1964); *Hudson v. Hudson,* 350 P.2d 596 (Okl.1960).

## II.

The wife argues that even if antenuptial agreements are not generally void as against public policy, the agreement involved here is invalid because it is unconscionable and constructively fraudulent as a matter of law. We do not agree.

2. Section 14–10–113, C.R.S.1973, recognizes that parties may agree to exclude certain of their property from classification as marital property and thereby insulate it from division by the court upon dissolution of their marriage. In relevant part that section provides:

"(1) In a proceeding for dissolution of marriage ... the court shall set apart to each spouse his property and shall divide the marital property [according to prescribed standards].

"(2) For purposes of this article only, 'marital property' means all property acquired by either spouse subsequent to the marriage except:

\* \* \* \* \* \*

"(d) Property excluded by valid agreement of the parties."

3. "With divorce such a commonplace fact of life, it is fair to assume that many prospective marriage partners whose property and familial situation is such as to generate a valid antenuptial agreement settling their property rights upon the death of either,

We consider separately the standard for the review of the validity of an antenuptial agreement concerning property division and one concerning maintenance.

## A.

█ By virtue of their betrothal, parties to an antenuptial contract are in a fiduciary relationship to one another. *In Re Estate of Lopata, supra; Kosik v. George,* 253 Or. 15, 452 P.2d 560 (1969); *Eubanks v. Eubanks,* 273 N.C. 189, 159 S.E.2d 562, 567 (1968). They, therefore, must act in good faith, with a high degree of fairness and disclosure of all circumstances which materially bear on the antenuptial agreement. *Estate of Stever, supra; Moats v. Moats, supra; In Re Marriage of Ingels, supra; In Re Estate of Lewin,* 42 Colo.App. 129, 595 P.2d 1055 (1979); *Braddock v. Braddock,* 91 Nev. 735, 542 P.2d 1060 (1975); *Clark, Antenuptial Contracts,* 50 U.Colo.L.Rev. 141, 144 (1979).

The court of appeals held in *In Re Marriage of Stokes,* 43 Colo.App. 461, 608 P.2d 824 (1980), which involved an antenuptial agreement relating to property division only, and not maintenance, that the conscionability review of separation agreements pursuant to section 14–10–112, C.R.S. 1973, does not extend to antenuptial agreements.[5] The wife argues that the *Stokes*

might want to consider and discuss also— and agree upon, if possible—the disposal of their property and alimony rights of the wife in the event their marriage, despite their best efforts, should fail." *Posner v. Posner,* 233 So.2d 381, 384 (Fla.1970).

4. Moreover, there is often a compelling basis for seeking such agreements. The frequency of divorce and the possible dilution of assets on remarriage are factors of prime concern. Those who have accumulated property may wish to safeguard their financial interests for themselves or their children. Although laws regarding property division on dissolution are flexible, it is not imprudent to remove uncertainty about the disposition of property in the event of divorce. We note that such agreements are becoming more common.

5. We note an apparent conflict in decisions of the court of appeals regarding the application of an unconscionability test to antenuptial agreements. *Compare In Re Marriage of Stokes, supra,* to later case of *Estate of Leb-*

case was wrongly decided. She relies on the Uniform Dissolution of Marriage Act and the official comments to section 306, thereof. Section 306 of the Uniform Act corresponds closely to the wording of the counterpart Colorado statute, section 14–10–112, C.R.S.1973.[6]

It is not at all clear that the Uniform Law was intended to extend conscionability review to antenuptial agreements relating to division of property and we decline to extend this level of review by judicial fiat. Antenuptial agreements are subject to a fairness review within the common law context of review for fraud, overreaching, or sharp dealing. Such an analysis must take place as of the time of execution of the contract and not as of the time of the separation, for if the spouses have freely, and intelligently entered into a contract fixing their economic status should the anticipated marriage subsequently fail, the court should not substitute its judgment and amend the contract unless the spouse seeking to invalidate the agreement can demonstrate non-disclosure, fraud or overreaching at the time of the making of the agreement. *In Re Estate of Lopata, supra.* A perfect or equal division of the marital property is not required to withstand scrutiny under this standard.

In our view, there are valid reasons for distinguishing between the review for unconscionability prescribed by the statute for separation agreements, section 14–10–112, *supra,* and the review of the antenuptial agreements which focus on the property the parties bring into the marriage, and which establish the parties' expectation of financial benefits to be obtained by virtue of the marriage.

Parties to an antenuptial agreement are concerned with entering into a marriage, and removing as much uncertainty as possible from the potential division of property in the event of the death of one of the parties or of the dissolution of the planned marriage between the parties. Although their relation is confidential and fiduciary at the time of the execution of the antenuptial agreement, compelling full disclosure and good faith, there is an assumption in the law that the parties are essentially able to act independently and rationally concerning their present and future property interests in relation to their prospective marriage. Once the stringent tests of full disclosure and lack of fraud or overreaching are met, the parties are free to agree to any arrangement for division of their property, including a waiver of any claim to the property of the other. Separation agreements, on the other hand, are designed to enable divorcing parties to reach an amicable out-of-court settlement of their claims to the property of the other as affected by the marriage relationship and the circumstances then existing.

As we examine the antenuptial agreement here executed, we are aware that Mrs. Newman in effect gave up substantial rights to marital property. However, she was a mature person who had once before been through the financial difficulties of a divorce. She decided not to obtain independent counsel. She had access to the records of her husband's financial interests when she worked for him as a bookkeeper and later during their two years of courtship. And, she freely made the decision with full knowledge that her husband was a person of substantial wealth.

---

*sock,* 44 Colo.App. 220, 618 P.2d 683 (1980). We adhere to the views expressed in *Stokes* that the test of unconscionability does not apply to antenuptial agreements dealing with division of property.

**6.** The official comments state as follows: "An important aspect of the effect to reduce the adversary trappings of marital dissolution is the attempt, made by Section 306, to encourage the parties to reach an amicable disposition of the financial and other incidents of their marriage. This section entirely reverses the older view that property settlement agreements are against public policy because they tend to promote divorce. Rather, when a marriage has broken down irretrievably, public policy will be served by allowing the parties to plan their future by agreeing upon a disposition of their property, their maintenance, and the support, custody, and visitation of their children...."

■ Thus, although the agreement might after the fact be considered imprudent, this court will not undo what the parties to the antenuptial agreement have freely agreed to. *In Re Marriage of Stokes, supra.* "Where no minor children are involved, as here, and where the husband and wife can function in society separately and independently, the interest of the state in the continuance of the marriage is small." *Volid v. Volid,* 6 Ill.App.3d 386, 286 N.E.2d 42, 46 (1972).

Should the legislature in its judgment perceive that the terms of antenuptial agreements involving property division should be reviewed for conscionability, it may so indicate. But as of this date, there is no announced public policy in this state which voids such contracts. Therefore, those who enter into such agreements in Colorado should do so cautiously and with attention to their interests, for in the final analysis they may receive only that for which they bargained.[7]

We have found no basis to differ from the result reached by the trial court and we affirm that judgment of the court of appeals upholding the enforcement of the property division terms of the antenuptial agreement.

### B.

We now address the concept of unconscionability as applied to an antenuptial agreement relating to maintenance on dissolution of marriage. The husband has appealed from the judgment of the court of appeals which declared void as against public policy the maintenance provisions of the antenuptial agreement. We do not agree with the holding of the court of appeals and therefore reverse on this issue.

■ There is no statutory proscription against contracting for maintenance in an antenuptial agreement. The same strict tests for full disclosure and absence of fraud and overreaching determine the basic validity of such provisions. However, such provisions may lose their legal vitality by reason of changing circumstances which render the antenuptial provisions for maintenance to be unconscionable at the time of the marriage dissolution. We hold that, even though an antenuptial agreement is entered into in good faith, with full disclosure and without any element of fraud or overreaching, the maintenance provisions thereof may become voidable for unconscionability occasioned by circumstances existing at the time of the marriage dissolution.

■ We arrive at this conclusion by considering, among other things, the public policy expressed and implicit in the Uniform Dissolution of Marriage Act. Section 14–10–102 provides:

"**14–10–102. Purposes—rules of construction.** (1) This article shall be liberally construed and applied to promote its underlying purposes.

(2) Its underlying purposes are:

(a) To promote the amicable settlement of disputes that have arisen between parties to a marriage;

(b) To mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage; and

(c) To make the law of legal dissolution of marriage more effective for dealing with the realities of matrimonial experience by making an irretrievable breakdown of the marriage relationship the sole basis for its dissolution."

One of the purposes of the Act is to mitigate potential harm to a spouse caused by the dissolution of marriage. This purpose militates against the strict enforcement of an antenuptial provision for maintenance

---

**7.** We realize that there is authority from other jurisdictions which would be in conflict with this result. *See, e.g., Ferry v. Ferry,* 586 S.W.2d 782 (Mo.App.1979); *Ranney v. Ranney,* 219 Kan. 428, 548 P.2d 734 (1976); *Friedlander v. Friedlander,* 80 Wash.2d 293, 494 P.2d 208 (1972); *Herman v. Goetz,* 204 Kan. 91, 460 P.2d 554 (1969). However, we believe that the question of validity is one for the legislature, and this court will not substitute its judgment as to the wisdom of such agreements. *See* section 14–10–113(2)(d), C.R.S.1973. We find no constitutional or statutory basis on which to invalidate the present antenuptial agreement.

which, while drafted with meticulous care and utmost good faith and perfectly reasonable at the time of the execution of the agreement, has since become unconscionable in terms of its application to the spouse at the time of the marriage dissolution. The policy to mitigate against potential harm is consistent with the legitimate governmental interest of the state generally to protect the health and welfare of its citizens. It is not unrealistic to recognize that the health and employability of the spouse may have so deteriorated during a marriage that to enforce the maintenance provisions of an antenuptial agreement would result in the spouse becoming a public charge. Thus, we do not subscribe to the view that the antenuptial agreement, even though entered into in accordance with the strict tests heretofore alluded to, is strictly enforceable regardless of intervening events which have rendered it in effect unconscionable.

Reinforcing our view are the provisions of the Act relating to court ordered disposition of property, section 14–10–113, and to maintenance, section 14–10–114. Section 113 authorizes a court to divide the marital property, except property excluded by a valid agreement of the parties. On the other hand, section 114 authorizes the court to order maintenance in accordance with the relevant factors therein specified, but this section does not make any exception to exclude valid prior agreements relating to maintenance. Separation agreements, as contrasted to antenuptial agreements, are subject to the tests of unconscionability both as to property and as to maintenance. Section 14–10–112. We view the absence of an exception in section 114, providing for maintenance, as evidence of a legislative intent not to preclude examination of antenuptial maintenance agreements for conscionability.

Having thus concluded that an antenuptial maintenance agreement is subject to judicial scrutiny for conscionability, we next examine the concept of unconscionability. Although the term unconscionability is not defined in the Act, we find guidance in the criteria expressed in 14–10–114, which define and circumscribe the court's authority to grant maintenance. That section provides:

"**14–10–114. Maintenance.** (1) In a proceeding for dissolution of marriage or legal separation or a proceeding for maintenance following dissolution of marriage by a court, the court may grant a maintenance order for either spouse only if it finds that the spouse seeking maintenance:

(a) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs; and

(b) Is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home."

In our view, unconscionability in the context of the Act as applied to a maintenance agreement exists when enforcement of the terms of the agreement results in a spouse having insufficient property to provide for his reasonable needs and who is otherwise unable to support himself through appropriate employment. *See In Re Lowery,* 39 Colo.App. 413, 568 P.2d 103 (1977), *aff'd,* 195 Colo. 86, 575 P.2d 430 (1978); *In re Wigner,* 40 Colo.App. 253, 572 P.2d 495 (1977); *In Re the Marriage of Eller,* 38 Colo.App. 74, 552 P.2d 30 (1976); *see also In Re Marriage of Higgason,* 10 Cal.3d 476, 110 Cal.Rptr. 897, 516 P.2d 289 (1973); *Marriage of Winegard,* 278 N.W.2d 505 (Iowa 1979).

"We have now come to the conclusion that antenuptial agreements concerning alimony should be enforced unless enforcement deprives a spouse of support that he or she cannot otherwise secure. A provision providing that no alimony shall be paid will be enforced unless the spouse has no other reasonable source of support." *Unander v. Unander,* 265 Or. 102, 506 P.2d 719, 721 (1973); *see also Parniawski v. Parniawski,* 33 Conn.Sup. 44, 359 A.2d 719 (1976); *Buettner v. Buettner,* 89 Nev. 39, 505 P.2d 600 (1973); *Volid v. Volid,* 6 Ill.App.3d 386, 286 N.E.2d 42 (1972); *Posner v. Posner,* 233

So.2d 381 (Fla.1970); *Hudson v. Hudson,* 350 P.2d 596 (Okl.1960).

Thus, one who claims that an antenuptial maintenance agreement is unconscionable must prove that at the time of the marriage dissolution the maintenance agreement rendered the spouse without a means of reasonable support, either because of a lack of property resources or a condition of unemployability.[8]

### III.

In the present case the trial court found no fraud or overreaching in the making of the antenuptial agreement, and found that the wife had knowingly agreed to execute an antenuptial agreement which fixed her rights in the event of divorce. It is apparent that the wife was sufficiently concerned with her future support that the antenuptial agreement included a provision that if she were to become disabled and unable to work for her own support, her husband would pay her $500 per month. The parties agreed at the time of the execution of the antenuptial agreement that the wife would continue her education with an intent to work for her own support, and she has made no showing that she is unable to do so. It appears from the record that in accordance with the mutual plan of the parties at the time of the execution of the agreement, the wife completed her college education during the marriage and at the time of the hearing on dissolution was employed as an accountant earning over $1,500 per month.

Applying the statutory criteria to the undisputed facts for the purpose of determining whether the antenuptial maintenance agreement is conscionable in relation to the reasonable needs of the wife as of the date of dissolution, we conclude that no unconscionability exists. The parties have no children. The wife has completed her education, is self-supporting, and earning $1,500 per month as an accountant. We further conclude that no reason exists to set aside the maintenance terms of the antenuptial agreement.

Accordingly, we affirm that portion of the decision of the court of appeals which upheld the provisions of the antenuptial agreement relating to the division of property. We reverse that portion of the court of appeals' decision which voids the provisions relating to the waiver of claims for maintenance.

ROVIRA, J., dissents as to Part II, B.

QUINN, J., does not participate.

ROVIRA, Justice, concurring in part and dissenting in part:

I concur in the result reached by the court and Parts I and II A of the opinion. For the reasons so well stated in Part II A concerning antenuptial agreements involving property division, I dissent from the court's analysis and conclusion in Part II B.

In essence, the court's opinion giveth with one hand and taketh with the other. While acknowledging that there is an assumption in the law that parties are able to act independently and rationally concerning matters relating to property, the court does not allow that assumption to operate when dealing with a maintenance provision in an antenuptial agreement. It departs from this assumption by finding a governmental interest in the health and welfare of its citizens and thereby concludes that the judiciary must interpose itself to protect persons who may have entered into a contract which, due to the passage of time, is not beneficial to them. I am of the view that such a determination is better left to the legislature.

---

**8.** We are aware that subjecting an antenuptial agreement providing for maintenance to a review by the court as to unconscionability diminishes the right of every person to contract in his own perceived best interests. However, the public policy considerations, in our view, override the liberty interest of persons to enter into contractual arrangements in the context of a proposed marriage relationship.