## Karkaria v. Karkaria

*Denise W. Ford*, for plaintiff
*Lea E. Anderson*, for defendant.

WETTICK, A.J., March 18, 1988—The husband (age 51) and the wife (age 50) were married on August 22, 1981. They separated on December 1, 1986. Shortly after the parties' separation, the wife instituted these divorce proceedings.

This marriage was the second for the husband and the third for the wife. Each party has children from their prior marriages.

The husband has a master's degree in civil engineering and has worked for Consolidation Coal Company since 1966. At the time of the marriage, he had an annual salary of approximately $38,000. At the time of the marriage, the wife had a nursing degree but she was not employed because of a work-related disability.

At the time of the parties' marriage, the husband had separate assets of approximately $200,000. These assets included a house which had a net value of approximately $27,000, an investment account through his employment which had a value of approximately $150,000, and pension benefits through his employment payable at retirement. The

wife, on the other hand, had minimal assets and debts that perhaps exceeded the value of her assets.

During the marriage, the values of the assets which the husband brought to the marriage have apparently increased. Also, the wife contends that the parties acquired other assets whose value exceeds $150,000. The assets acquired during the marriage have always been titled in the name of the husband. They were apparently acquired with funds which the husband received from his employment.

The wife's complaint for divorce includes claims for equitable distribution and alimony. The husband has filed an answer to the complaint in which he contends that these claims are waived by an August 19, 1981 antenuptial agreement which the parties executed. This agreement contains the following provisions which are relevant to the husband's contention that the wife has waived all rights to claim any economic benefits under the Divorce Code.

"(7) The parties hereto do further covenant and agree that all property, whether real or personal, owned or possessed by each party prior to their marriage shall at all times relevant hereto remain as their own individual and separate property during the marriage and after the marriage if the parties hereafter divorced and that no appreciation in the value of said personal or real property of either party shall be considered marital property as set forth in the Pennsylvania Divorce Reform Code of 1980.

"(8) It is further agreed and understood between the parties that all property acquired during the marriage by either party will, unless otherwise agreed upon in writing and signed by both parties, be acquired individually by each or either party and will at all times relevant hereto remain the personal property of the individual so acquiring the real or

personal property in question, and that any increase in the value of said property shall not be considered marital property pursuant to the Pennsylvania Divorce Reform Code of 1980.

"In the event that both parties desire to acquire any real or personal property as joint tenants and/or joint tenants with the right of survivorship and/or as tenants by the entireties, a separate written agreement shall be executed and signed by each party setting forth the degree of ownership by each party and further setting forth the specific rights and liabilities as to that particular piece of property.

. . .

"(11) It is specifically agreed, understood and covenanted that a full disclosure of the extent and value of the estate of each party has been made and the wife covenants and agrees that in case she survives the husband, or during the husband's life that she will not, at any time in the future, directly or indirectly or through any person or persons whomsoever, raise the claim of fraud and she waives all presumption of fraud that may arise with full knowledge of her rights under the intestate laws and Divorce Reform Code of the Commonwealth of Pennsylvania and with further knowledge that she would be entitled to share in the estate of the husband in the event of the decease of him, and further that she has certain rights which have been disclosed to her regarding the Pennsylvania Divorce Reform Code, all of which she has waived by this agreement.

"(12) It is specifically agreed, understood and covenanted that a full disclosure of the extent and value of the estate of each party has been made and the husband covenants and agrees that in case he survives the wife, or during the wife's life that he will not, at any time in the future, directly or indi-

rectly or through any person or persons whomsoever, raise the claim of fraud and he waives all presumption of fraud that may arise with full knowledge of his rights under the intestate laws and Divorce Reform Code of the Commonwealth of Pennsylvania and with further knowledge that he would be entitled to share in the estate of the wife in the event of her decease and further that he has certain rights which have been disclosed to him regarding the Pennsylvania Divorce Reform Code, all of which he has waived by this agreement.

"(13) It is further understood, agreed and covenanted that each party to this agreement hereby expressly waives and relinquishes all rights and claims to alimony, alimony pendente lite and support that they may have now or in the future pursuant to the 1980 Pennsylvania Divorce Reform Code, having been fully advised of those rights and obligations by legal counsel of their own choosing.

"(14) The parties hereto do hereby further expressly waive and relinquish all rights and claims to equitable distribution and equitable relief under the 1980 Divorce Reform Code of Pennsylvania, having been fully advised of those rights and obligations by legal counsel of their own choosing.

"(15) It is further covenanted and agreed and each party hereto does hereby expressly waive and relinquish all rights and claims pursuant to the Divorce Reform Code of 1980 other than the right to seek a decree of divorce pursuant to that act, but do hereby expressly waive and relinquish all rights to any claims set forth in the Pennsylvania Divorce Reform Code of 1980, each party having been fully advised by legal counsel as to their rights and obligations under that act.

. . .

"(20) If any term, condition, clause, or provision

of this agreement shall be determined or declared to be void or invalid in law or otherwise, then only that term, condition, clause or provision shall be stricken from this agreement and in all other respects this agreement shall be valid and continue in full, force, effect and operation."

In accordance with the procedures of this court, the wife listed the case for a pretrial conference on her claims for equitable distribution and alimony. At the pretrial conference, it was agreed that the court would initially consider whether the wife's claims are barred by the August 19, 1981 antenuptial agreement. This issue was to be decided on the basis of the pleadings and deposition testimony that the parties would submit.

## I

Initially, we consider whether the August 19, 1981 antenuptial agreement was intended to bar the wife from raising any claims for equitable distribution and alimony in the event of divorce.

The wife's equitable distribution claim includes increases in the values of the property which the husband brought to the marriage. See *Anthony v. Anthony*, 355 Pa. Super. 589, 514 A.2d 91 (1986), which held that increases during the marriage in the value of premarital assets are marital property. Through paragraph 7 of the antenuptial agreement, the husband intended to exclude these increases from any equitable distribution claim. This paragraph states that the parties agree that all property owned by either party prior to the marriage shall remain individual and separate property during the marriage and that upon divorce, no appreciation in the value of the property is to be considered marital property.

The wife's claim for equitable distribution also includes property that was acquired during the marriage with funds that the husband earned from his employment. Through paragraphs 8, 14, and 15, the husband intended to exclude this property from any equitable distribution claim. Paragraph 8 states that all property acquired during the marriage shall be acquired individually by a party and shall remain the property of that party and that no property shall be treated as property that is owned jointly in the absence of a written agreement executed and signed by the parties. Paragraph 14 states that the parties waive and relinquish all rights and claims to equitable distribution. Paragraph 15 states that the parties waive all rights and claims pursuant to the Divorce Code other than the right to seek a decree of divorce.

The antenuptial agreement was also intended to bar the wife's claim for alimony. Paragraph 13 states that each party waives and relinquishes all rights and claims to alimony, alimony pendente lite, and support that they may have now or in the future pursuant to the Divorce Code of 1980.

## II

We next consider whether provisions of an antenuptial agreement waiving claims for equitable distribution and alimony will be enforced. As we will discuss in Part III of this opinion, the Pennsylvania appellate courts have never ruled on the validity of provisions in an antenuptial agreement waiving property and support rights upon divorce. Consequently, we will begin our consideration of the issue by examining the case law of other jurisdictions.

Historically, the courts of this country have treated antenuptial agreements in contemplation of

death very differently from antenuptial agreements in contemplation of divorce. Agreements waiving or limiting a spouse's right to inherit from the other spouse have been upheld provided that there was full disclosure of the deceased spouse's financial worth and the absence of fraud, duress, or undue influence in the procurement of the agreement. In these cases, the deceased spouse typically came to the marriage with a separate estate and children from a prior marriage. The typical antenuptial agreement excluded only property which the deceased spouse brought to the marriage. Courts have consistently ruled that these agreements do not violate public policy because the purpose of the legislation protecting a spouse from disinheritance is to recognize that spouse's contributions to the marriage during the years that the property was accumulated.

Courts have taken a very different approach to provisions in antenuptial agreements affecting property and support rights upon divorce. Prior to 1970, courts almost uniformly found these agreements to be void as against public policy. Two basic policy arguments were utilized for invalidating the agreements. First, these agreements were considered to be both incompatible with the status of marriage and contrary to the state's interest in preserving marriage. Second, the state had an interest in protecting the financial security of divorced persons.

Beginning in 1970 with *Posner v. Posner*, 233 So.2d 381 (Florida Supreme Court, 1970), the appellate courts of other jurisdictions have consistently overruled the previous case law invalidating provisions in antenuptial agreements affecting property and support rights upon divorce on the ground that they will encourage divorce. The ration-

ale for the post-1970 case law is that states no longer seek to preserve a marriage if the relationship is irretrievably broken.

The cases cited below describe in detail the development of the law governing the validity of an antenuptial agreement in contemplation of divorce. In each of these cases, the courts rejected the prior case law holding that such agreements are void as against public policy on the ground that they encourage divorce: *Frey v. Frey*, 471 A.2d 705 (Court of Appeals of Maryland, 1984); *Gross v. Gross*, 464 N.E.2d 500 (Ohio Supreme Court, 1984); *Brooks v. Brooks*, 733 P.2d 1044 (Supreme Court of Alaska, 1987); *Marshall v. Marshall*, 477 A.2d 833 (New Jersey Superior Court, Chancery Division, 1984); *Ferry v. Ferry*, 586 S.W.2d 782 (Missouri Court of Appeals, 1979); *In re Marriage of Boren*, 475 N.E.2d 690 (Indiana Supreme Court, 1985); and *Osborne v. Osborne*, 428 N.E.2d 810 (Massachusetts Supreme Court, 1981).

As each of these cases recognizes, once the antenuptial agreement waiving rights upon divorce is no longer invalidated on the ground that it promotes divorce, the second policy consideration that many pre-1970 cases cited as a basis for invalidating antenuptial agreements in contemplation of divorce—the state's concern for the financial security of divorced spouses—becomes the critical factor. The issue is usually framed in terms of whether an agreement waiving rights upon divorce or separation will be enforced so long as it meets the standards that have traditionally governed antenuptial agreements in contemplation of death—full disclosure of financial worth and no showing of fraud, duress, or undue influence in the procurement of the agreement—or whether the public policy consider-

ations for providing equitable distribution and support will bar the enforcement of the agreement.

The issue arises most frequently when a court is requested to enforce a provision in an antenuptial agreement waiving alimony or alimony pendente lite. Some courts hold that these provisions are null and void as against public policy. These courts, citing the support provisions of the marriage and divorce laws, conclude that the state intended for the marriage contract to include a continuing obligation to provide support and refuse to recognize any agreement which would circumvent this legal duty. See *In re Marriage of Winegard,* 278 N.W.2d 505 (Iowa Supreme Court, 1979); *In re Marriage of Higgason,* 516 P.2d 289 (California Supreme Court, 1973) (the obligation of support resulting from the marriage contract exists throughout the lifetime of the parties); *Holliday v. Holliday,* 358 So.2d 618 (Louisiana Supreme Court, 1978); *Duncan v. Duncan,* 652 S.W.2d 913 (Tennessee Court of Appeals, 1983); and *Connolly v. Connolly,* 270 N.W.2d 44 (South Dakota Supreme Court, 1978).

Other courts hold that the parties may enter into antenuptial agreements waiving or modifying alimony and alimony pendente lite rights but that these provisions will not be enforced (no matter what disclosure has been made) if they fall below a certain substantive "fairness" standard. The leading case for this position is *Newman v. Newman,* 653 P.2d 728 (Colorado Supreme Court, 1982). The *Newman* court held that the public policy expressed in the Divorce Code of mitigating potential harm to a spouse caused by the dissolution of the marriage barred enforcement of an antenuptial agreement which would produce an unconscionable result.

"One of the purposes of the act is to mitigate potential harm to a spouse caused by the dissolution of

marriage. This purpose militates against the strict enforcement of an antenuptial provision for maintenance which, when drafted with meticulous care and utmost good faith and perfectly reasonable at the time of the execution of the agreement, has since become unconscionable in terms of its application to the spouse at the time of the marriage dissolution." *Id.* at 734-5.

The court further held that those factors which govern the award of alimony will be utilized to determine whether provisions in an antenuptial agreement waiving or modifying alimony rights produce an unconscionable result.

"In our view, unconscionability in the context of the act as applied to a maintenance agreement exists when enforcement of the terms of the agreement results in a spouse having insufficient property to provide for his reasonable needs and who is otherwise unable to support himself through appropriate employment. [citations omitted]

. . .

"Thus, one who claims that an antenuptial maintenance agreement is unconscionable must prove that at the time of the marriage dissolution the maintenance agreement rendered the spouse without a means of reasonable support, either because of a lack of property resources or a condition of unemployability." (footnote omitted) *Id.* at 735-6.

Also see *Hill v. Hill,* 356 N.W.2d 49 at 57 (Minnesota Court of Appeals, 1984) (the court said that in "weighing the public policy interest in the welfare of a spouse against the rights of parties to freely contract, we conclude that there must be reserved to the court at the time of a marriage dissolution the power to review maintenance provisions of an antenuptial agreement to determine the con-

scionability of those provisions"); *Posner v. Posner, supra* (the Florida Supreme Court held that antenuptial agreements governing alimony would be subject to modification upon a showing of changed circumstances); *Marschall v. Marschall, supra* (the New Jersey Superior Court in refusing to enforce an antenuptial agreement governing alimony proposed a "fairness" test that would take into account the standard of living during the marriage, the standard of living prior to the marriage, and other factors such as the length of the marriage, and whether the marriage produced children); *McHugh v. McHugh*, 436 A.2d 8 at 12 (Connecticut Supreme Court, 1980) (antenuptial agreement would not be enforced where "the circumstances of the parties at the time of the dissolution are so far beyond the contemplation of the parties at the time the agreement was made as to make enforcement of the agreement work an injustice"); *Button v. Button*, 388 N.W.2d 546 at 551 (Wisconsin Supreme Court, 1986) (agreement "should in some manner appropriate to the circumstances of the parties take into account that each spouse contributes to the prosperity of the marriage by his or her efforts"); *Frey v. Frey, supra* (Maryland Court of Appeals requires that the agreement be fair and equitable); *Gross v. Gross, supra* at 509-10 (Ohio Supreme Court requires that the agreement be conscionable and reasonable— "The trial court, in the determination of the issue of conscionability and reasonableness of the provision for sustenance or maintenance of a spouse at the time of divorce, shall utilize the same factors that govern the allowance of alimony. . . ."); *Huck v. Huck,* 734 P.2d 417 at 419 (Utah Supreme Court, 1986) (provisions eliminating alimony are not binding on a court but serve "only as a recommendation"); *Osborne v. Osborne, supra* (Massachusetts

Supreme Court held that the agreement must be fair and reasonable at the time of the court proceeding); and *Lewis v. Lewis*, 14 Family Law Rptr. 1161 (Hawaii Supreme Court, 1988) (agreement may not permit a post-divorce economic situation that is unjustly disproportionate—this determination may be made only by considering all relevant factors and circumstances at the time of the divorce).

In summary, antenuptial agreements waiving support rights are carefully scrutinized in order to preserve the strong public policy in favor of protecting a divorced spouse who lacks sufficient property or job skills to provide for his or her reasonable needs.

Provisions of an antenuptial agreement governing property rights upon divorce receive more favorable treatment. The typical agreement seeks to protect only that property (including increases in value during the marriage) which a spouse brought to the marriage or acquired by gift or inheritance during the marriage. These agreements are not viewed as overriding public policy because this property was not acquired through the contributions of either spouse to the marriage. Thus, the same public policy considerations that serve as the basis for the well-established case law permitting a spouse to protect separate property from inheritance are applicable.

Because of the similarity between the antenuptial agreement protecting separate property upon divorce and the antenuptial agreement protecting separate property upon death, many courts state that the provisions of an antenuptial agreement waiving property rights upon divorce should be governed by the same standards—enforcement so long as there was full disclosure of financial worth and no showing of fraud, duress; or undue influence. See, e.g., *Brooks v. Brooks, supra; In the Matter of*

*the Estate of Crawford,* 730 P.2d 675 (Washington Supreme Court, 1986); *Hill v. Hill, supra; Gross v. Gross, supra; Newman v. Newman, supra;* and *Huck v. Huck, supra.*

Other courts appear to apply the same standards of substantive fairness and conscionability that govern provisions waiving or limiting alimony. *Marschall v. Marschall, supra* (agreement is subject to a yet-undetermined level of fairness or conscionability); *McHugh v. McHugh, supra* (agreement may be void if it creates substantial economic advantage upon dissolution or if the circumstances of the parties at the time of dissolution are far beyond the contemplation of the parties at the time the agreement was made); *Ferry v. Ferry, supra* (provisions must be conscionable); *Osborne v. Osborne, supra* (agreement must be fair and reasonable at the time of the court proceeding); and *Lewis v. Lewis, supra* (the agreement must be fair, in light of the circumstances, at the time of execution).

Since most of the case law considering the validity of provisions of antenuptial agreements governing property rights upon divorce dealt with agreements excluding only property (including increases in value) acquired prior to the marriage or during the marriage by gift and inheritance, it is very possible that provisions waiving claims to property acquired during the marriage through earned income will be subject to a higher standard of scrutiny.

In *Williams v. Williams,* 569 S.W.2d 867 (1978), the Supreme Court of Texas, while upholding provisions in an antenuptial agreement protecting property brought to the marriage, held that the portion of the agreement providing that earned income and other property acquired during the marriage shall be the separate property of the party who earned the income or acquired the property violated both the

Family Code and the Texas Constitution. In *Gross v. Gross, supra,* the dissenting opinion, joined in by three members of the Supreme Court of Ohio, proposed that antenuptial agreements be judged by a conscionability standard. Under this standard, an agreement which waived any claim to property brought to the marriage by either party would be valid but an agreement which waived any claim of a spouse to property acquired during the marriage, regardless of that spouse's contributions or other circumstances, may be unconscionable. The basis for the dissenting opinion was:

"The archaic notion that the only contributions of any value to a marriage are those of a wage-earning husband, and not those of a homemaker, has long ago been discarded. An antenuptial agreement which would give economic substance to such a sexist concept would certainly be unconscionable and, for a court to enforce it, unjust." 464 N.E.2d at 512.

On the basis of this review of the case law of other jurisdictions addressing the validity of antenuptial agreements governing property and support rights upon divorce, we reach the following conclusions. First, antenuptial agreements affecting property and support rights upon divorce will no longer be automatically struck down on the ground that they encourage divorce. But an agreement may still be invalidated on this ground if the financial incentives for divorce are too great. (See, for example, *In re Marriage of Noghrey,* 215 Cal. Rptr. 153, 169 Cal. App.3d 326 (1985), in which a wife who filed for divorce seven and one-half months after marriage sought to enforce an antenuptial agreement giving her a house and one-half million dollars or one-half of the husband's assets, whichever is greater). Sec-

ond, courts will not enforce antenuptial agreements unless there has been procedural fairness. Procedural fairness includes disclosure of financial worth, the absence of fraud or duress, and possibly a showing that the agreement was knowingly and intelligently entered into. Third, agreements are not likely to be enforced if they are substantively unfair. The support and property distribution provsions of the divorce codes embody a public policy that cannot be completely overridden by agreement.

We believe that the summary of the law set forth in *A Reconnaissance of Public Policy Restrictions Upon Enforcement of Contracts Between Cohabitants*, 18 Family Law Quarterly 93 (Spring 1984), accurately reflects the position of most courts:

"The above discussion suggests that all American courts, even those applying the 'modern' approach, remain reluctant to enforce marital agreements that alter the support obligations and property rights that would have arisen upon divorce absent the prenuptial agreement. Particularly suspect are those agreements reducing property or support rights of the less sophisticated spouse. Strong state interests support this approach. A state does not want either divorcing spouse or any children of the marriage to become a ward of the state. In addition, the state desires to ensure that divorcing spouses will have the financial ability to lead a productive life after divorce. Finally, if neither spouse suffers financial hardship after divorce, marital discord will likely be minimized, which in turn will promote a more stable home for children of the marriage. For these reasons, substantial restrictions are still imposed by all courts upon the enforceability of marital agreements that address the consequences of divorce. *Id.* at 105-6 (footnotes omitted).

## III

We now look to the case law of Pennsylvania governing antenuptial agreements. This case law has dealt almost exclusively with provisions involving the distribution of property at death. See e.g., *In re Estate of Harrison*, 456 Pa. 356, 359, 319 A.2d 5, 7 (1974), where the court said that "[a]ntenuptial agreements are instruments designed and executed for a particular purpose—to alter or extinguish a spouse's statutory rights of inheritance." In the absence of fraud or duress, Pennsylvania courts enforce antenuptial agreements governing inheritance rights provided that there has been a full disclosure of financial worth. The applicable standards for reviewing the validity of antenuptial agreements are set forth in *In re Estate of Hillegass*, 431 Pa. 144, 244 A.2d 672 (1968).[1]

This case law upholding antenuptial agreements waiving rights of inheritance appears to address

---

1. The Pennsylvania Supreme Court is currently divided on the question of whether to apply more or less stringent standards than those enunciated in *In re Estate of Hillegass*, *supra*, in determining the validity of antenuptial agreements. In the case of *In re Estate of Geyer*, 516 Pa. 492, 533 A.2d 423 (1987), the court considered the validity of an antenuptial agreement under which the wife waived her rights to any statutory inheritance claims upon the death of her husband. The opinion of Justice McDermott announcing the judgment of the court in which two other justices concurred imposed an additional requirement that a spouse have full awareness of the statutory rights which the spouse is relinquishing before a court will enforce an antenuptial agreement that does not include a reasonable provision for that spouse. The concurring opinion of Justice Zappala in which Justice Papadakos joined continues to follow the *Hillegass* standards. The dissenting opinions of Chief Justice Nix and Justice Flaherty apply traditional rules of contract which do not require any disclosure of financial worth.

only claims by a widow or widower for a share of the property which the deceased spouse brought to the marriage. The justification which the case law offers for enforcing the antenuptial agreement is that the property was acquired without the assistance of the surviving spouse. See *Zeigler Estate*, 381 Pa. 436, 440-1, 113 A.2d 271, 273 (1955), where the court stated:

"It is not apparent, as the appellant claims, that the agreement was unfair and unconscionable. Speaking on the subject of antenuptial contracts, Chief Justice Paxson said in the case of *Neeley's Appeal*, 124 Pa. 406, 426, 16 Atl. 883, 885: 'There is a marked distinction between this case and that of a young couple just entering upon the voyage of life. In the latter instance they grow up together; the wife is the mother of his children; she shares his burdens in his early struggle, and often by her thrift and economy materially aids him in the accumulation of his fortune. To cut off such a wife with a mere support during life would be as unjust as it would be ungenerous. But when a man in the decline of life, who has been twice a widower, and who has two sets of children, for the third time leads a woman to the altar, and an elderly woman at that, it is very different. In such case the wife reaps where she has not sown, and if she is provided with a comfortable support after her husband's death she has no just cause of complaint. In any event, if she is dissatisfied she ought to refuse to sign the contract, and not accept its benefits during her husband's life, and then seek to repudiate it after his death.'

"The Wills Act which protects a widow from any attempt on the part of the husband to disinherit her is one of the most just and salutary statutes in the books because it throws a cloak of security around the woman who is deserving of protection after long

years of faithful service at her husband's side. If there were anything savoring of injustice and ingratitude in this case by the way of a man's dismissing his conjugal mate just as they were both about to enter the port of comfort and security after many years on the ocean of adversity, struggle, and sacrifice, some argument could be made with regard to whether or not the Zeigler agreement was a fair and conscionable one. But there is nothing like that here. The voyage was about done, the ship was almost ready for dry dock when William Zeigler took Elizabeth Anderson aboard. Zeigler may well have felt that he owed something to his three children who had helped to man the family vessel on its long journey. Mrs. Zeigler knew of these children before she took passage on her husband's ship. At no time was there the slightest suggestion of concealment of facts from her by her husband." *Zeigler Estate, supra.* Also see *McCready's Estate,* 316 Pa. 246, 175 Atl. 554 (1934).

Prior to the enactment of the Divorce Code of 1980, no Pennsylvania appellate courts had decided whether provisions of an antenuptial agreement affecting a spouse's rights upon divorce will be enforced. The apparent explanation is that prior to the enactment of the 1980 Divorce Code, Pennsylvania did not award alimony, and property acquired during the marriage was distributed according to title. Thus, a dependent spouse had no support or property rights to waive.

On two occasions appellate court opinions, in dicta, discussed provisions of antenuptial agreements waiving rights upon divorce. In the case of *Belsky v. Belsky,* 196 Pa. Super. 374, 175 A.2d 348 (1961), the court cited the case law governing antenuptial agreements waiving inheritance rights in its discussion of the validity of an antenuptial

agreement governing support and property distribution upon divorce. However, the court was not required to determine the validity of the antenuptial agreement upon which the husband relied because the case involved only the wife's claim for alimony pendente lite and the antenuptial agreement, as construed by the court, did not address claims for alimony pendente lite.

In *Estate of Slight,* 467 Pa. 619, 359 A.2d 773 (1976), the court considered the contention that the support claim brought by a wife against the husband who had been declared incompetent was barred by an antenuptial agreement. The court rejected this contention because the agreement governed only rights upon the death of a spouse. The opinion contained the following dicta concerning antenuptial agreements governing matters other than death:

"Although they may cover various aspects of the marital relationship, antenuptial agreements usually are 'instruments designed and executed for a particular purpose—to alter or extinguish a spouse's statutory rights of inheritance' (citation omitted). . . . Of course, there is nothing to prevent a contractual agreement between a prospective husband and wife from speaking also or alternatively to financial affairs during coverture, including a disavowal of the husband's duty of support.[6] *Id.* at 623-4, 359 A.2d at 775 (citations omitted)

"6. Traditionally any such attempt to absolve a husband of his support obligation has been viewed askance by the courts. The obligation has been regarded as 'paramount', one 'imposed by law as an incident of the marital status and the legal entity of the husband and wife.' " (citations omitted) (footnote part of quotation.)

Other pre-1980 case law deals with the validity of separation agreements. These agreements are enforced in the absence of fraud or duress. As other ju-

risdictions uniformly recognize, the case law governing these agreements is not applicable to the antenuptial agreement governing property and support rights upon divorce.

A property settlement agreement comes at a time when relations have already deteriorated. Its purpose is to resolve a dispute. Discovery is available, the parties are dealing at arm's length, and the proceeding is adversarial. Furthermore, the parties are fully aware of the property that is governed by the agreement and the contributions that each has made to the marriage. Thus, a party enters into the agreement only if that party determines that the agreement will better serve his or her interests than the results that may be achieved through litigation.

The antenuptial agreement, on the other hand, is entered into when the relationship is at its closest and when the parties are least likely to be dealing with each other at arm's length. It is intended to govern a party's rights at an unknown later date when the parties' circumstances may be very different. It is not an agreement reached "in the shadow of the law." See Mnookin and Komhauser, *Bargaining in the Shadow of the Law: The Case of Divorce,* 88 Yale L.J. 950 (1979). In the vast majority of the cases, the purpose of the agreement is not to give rights to both parties that may be preferable to the results that would be achieved through litigation. To the contrary, the agreement is usually entered into at the request of the party with the superior financial position for the purpose of giving the other spouse fewer rights than the statutory law provides. See, generally, *Marschall v. Marschall, supra,* at 840.

The only other cases of any apparent relevance are those which have addressed the impact of antenuptial agreements waiving support and prop-

erty rights that were entered into prior to the enactment of the Divorce Code with respect to claims for alimony and equitable distribution that are based on the Divorce Code. See *Laub v. Laub,* 351 Pa. Super. 110, 505 A.2d 290 (1986) and *Fox v. Fox,* 31 D.&C.3d 30 (1984), which enforced the provisions of pre-1980 antenuptial agreements on the basis of section 103 of the Divorce Code which states that:

"This act shall not affect any marital agreement executed prior to the effective date of this act and any amendment or modification thereto." 23 P.S. §103.

Also see *Wolfe v. Wolfe,* 341 Pa. Super. 313, 491 A.2d 281 (1985), which relied on this same section of the Divorce Code to support its holding that a post-nuptial agreement entered into prior to the enactment of the Divorce Code barred claims for equitable distribution and marital property.

This case law offers no guidance to this court as to the validity of the provisions in an antenuptial agreement entered into after the enactment of the Divorce Code. The courts upheld these pre-1980 agreements solely because of section 103 which is limited to marital agreements "executed prior to the effective date of the act." At the time that these agreements were made, waivers of alimony and claims to property owned by the other spouse did not violate public policy because Pennsylvania law did not provide for alimony or the distribution of property owned by only one spouse. Through section 103, the legislature provided that agreements entered into prior to the enactment of the Divorce Code may not be set aside on the basis of any public policy created through the enactment of the Divorce Code.

Because the issue of the validity of provisions within post-1980 antenuptial agreements governing

property and support rights upon divorce has not been addressed by the Pennsylvania appellate courts, we look to the provisions of the Pennsylvania Divorce Code, its legislative history, and the case law of other jurisdictions to determine the validity of such antenuptial agreements.

We conclude that antenuptial agreements governing property and support rights upon divorce are not necessarily inconsistent with Pennsylvania's strong public policy favoring marriage. The provisions of the 1980 Divorce Code permitting no-fault divorce establish that Pennsylvania does not seek to preserve marriages where the relationship between the husband and the wife is irretrievably broken. Consequently, antenuptial agreements that do not encourage dissolution of marriages unless the relationship is irretrievably broken do not violate the public policy favoring marriage.

We also conclude that antenuptial agreements affecting property and support rights upon divorce will be subject to the same procedural standards of fairness that govern antenuptial agreements affecting rights upon death. The statutory rights governing support and the distribution of property in the Divorce Code are at least as significant as those statutory rights governing inheritance, so the same procedural safeguards should be applied.

The remaining issue is whether Pennsylvania will require that antenuptial agreements governing property and support rights be substantively fair. We conclude that Pennsylvania should follow the case law of other jurisdictions that most carefully scrutinizes these agreements, because an important purpose of "divorce reform" within Pennsylvania was to confer financial benefits on divorced spouses who require support or whose non-economic contri-

butions contributed to the parties' accumulation of assets.

Under prior law, the division of property acquired during the marriage depended entirely on title. If the property was titled in both names, upon divorce both parties had an undivided one-half interest in the property as tenants in common. If the property was titled only in the name of one spouse, upon divorce the other spouse had no claim to the property in the absence of a showing that his or her funds were used to acquire the property. Thus, upon divorce, a homemaker and primary caretaker of the children frequently had no claim to substantial assets acquired during the marriage because the other spouse, as the primary wage earner, used his or her earnings to acquire assets which this spouse placed in his or her name alone. Also under prior law, a party was not entitled to alimony following the entry of a divorce decree. Consequently, if a spouse did not work outside the home during the marriage, upon divorce that spouse would be without support.

But under prior law, no party could obtain a divorce except upon a showing of fault and so long as the parties were married, a financially dependent spouse was entitled to support. This legislative scheme provided substantial financial protection to a dependent spouse. Upon marriage, a financially dependent spouse was entitled to support for life so long as that spouse engaged in no conduct that would constitute a ground for divorce. Under this law, the dependent spouse who was not seeking to remarry had tremendous leverage. There would be no divorce unless the other spouse entered into a property settlement agreement that was agreeable to the dependent spouse.

But the cost of protecting this spouse was high. Neither party could remarry even though the mar-

riage was irretrievably broken. Also, a dependent spouse who was the victim of physical or emotional abuse could terminate the marriage only at the cost of forfeiting all rights to support and property titled in the other spouse's name.

The Divorce Code of 1980 drastically changed the protections available to the dependent spouse. Now either party, regardless of fault, was able to obtain a divorce following a three-year separation.[2] Thus, the financially dependent spouse was no longer guaranteed financial support until the parties worked out a property settlement agreement agreeable to that spouse. However, the Divorce Code replaced the protections that the previous law afforded the dependent spouse with equitable distribution and alimony rights which were designed to protect this spouse.

The provisions of the Divorce Code guaranteeing financial protection to a divorced spouse were part and parcel of the right to obtain a no-fault divorce. The legislative intent is expressed in the following objectives set forth in section 102(a) of the Divorce Code:

"(4) Mitigate the harm to the spouses and their children caused by the legal dissolution of the marriage.

. . .

"(6) Effectuate economic justice between parties who are divorced or separated and grant or withhold alimony according to the actual need and ability to pay of the parties and insure a fair and just determi-

---

2. Through the 1988 amendments to the Divorce Code, the legislature reduced the waiting period for a no-fault divorce to two years. The same legislation broadened the alimony provisions.

nation and settlement of their property rights." 23 P.S. §102(a).

The Divorce Code effectuates economic justice through its equitable distribution and alimony provisions. Section 401(d), as amended (23 P.S. §401(d)) sets forth 11 factors that are to be considered in distributing property acquired during the marriage. Most of these factors are intended to protect the spouse with the more limited earnings and earning capacity and to give recognition to the non-monetary contributions to the marriage. Similar factors govern the award of alimony (23 P.S. §501).

In the present case, the wife executed the August 19, 1981 antenuptial agreement at the husband's insistence. At the time it was executed, it appears that the agreement was intended to favor the husband. In all likelihood, he would continue to have substantially higher earnings, these earnings would be the source of most of the property acquired during the marriage, and this property would be placed in his name. Its clear purpose was to prevent the wife from receiving the financial protections provided for by the Divorce Code.

The agreement preserved only those changes in the divorce law that favored the husband—the right to obtain a divorce without proving fault. It waived all changes designed to protect the dependent spouse who could no longer protect himself or herself simply by refusing to agree to a divorce. The agreement distributed property acquired during the marriage through a method that is diametrically opposed to the policies of the Divorce Code by giving no weight to the non-economic contributions of either party to the marriage and by basing distribution almost exclusively on the amount of the parties' earnings during the marriage. Furthermore, the provision waiving alimony regardless of the eco-

nomic circumstances of the parties and their contributions to the marriage is inconsistent with the alimony provisions of the code.

The objectives of the Divorce Code of mitigating harm to spouses and the parties' children caused by the legal dissolution of the marriage and of effecting economic justice between the parties by granting and withholding alimony according to actual need and ability to pay and insuring a fair and just determination of the settlement of property rights are conditions for obtaining a no-fault divorce. The purpose of the Divorce Code was not to create a framework for resolving financial issues when the parties failed to provide their own framework. Its purpose was establish a public policy that gives recognition to services performed in the home and protection to an economically dependent spouse.

As a general rule, parties may not waive statutory protections unless there are significant policy considerations favoring these waivers. See, e.g., *Mayhugh v. Coon,* 460 Pa. 128, 331 A.2d 452 (1975); *Resolute Insurance Co. v. Pennington,* 423 Pa. 472, 224 A.2d 757 (1966). There are no competing policy considerations that would favor broad waivers of the property and alimony rights provided for by the Divorce Code.

The husband argues that antenuptial agreements are useful because they provide more certainty to the parties, reduce the work of the court, and reduce litigation expenses. These policy considerations cannot serve as a basis for overriding the provisions of the Divorce Code intended to effectuate economic justice. If these were important policy considerations, the Divorce Code of 1980 could merely have created the right to obtain a no-fault divorce or could have created a simpler formula for resolving equitable distribution and alimony claims.

When the Divorce Code of 1980 was enacted, it was recognized that increased judicial resources and litigation expenses would be incurred in order to resolve the economic issues because of the numerous factors that must be considered in resolving claims for equitable distribution and alimony. Since the legislature selected this method for resolving equitable distribution and alimony claims, it concluded that the substantive fairness that would be achieved by considering these factors outweighs the increased costs of administration.

The husband argues that the agreement should be enforced because both parties knew what they were signing. But this is no reason for defeating a public policy intended to give recognition to services performed in the home and to protect the standard of living and welfare of both parties. Frequently, a party to a failed marriage eventually realizes that he or she was guilty of mistaken trust and bad judgment at the outset. This party has already paid for these mistakes through a failed marriage. There is no reason why the law would seek to have this party suffer further by enforcing a one-sided agreement that was entered into because of this mistaken trust and bad judgment.

Finally, the argument is made that prenuptial agreements governing property and support rights upon divorce need not be carefully scrutinized because the financial protections afforded the dependent spouse are based on an "outmoded" view of society which assumes that women will remain in the home and are incapable of achieving financial independence. This argument is without merit. The Divorce Code is not based upon factors related to sex but, instead, upon factors related to the role of the spouse during the marriage. While the wife is no longer as likely to make significant career sacrifices

for the marriage, it is still likely that a marriage will result in one spouse giving greater priority to the home and less priority to the pursuit of a successful career. The Divorce Code seeks to protect this spouse.

Furthermore, Pennsylvania's "divorce reform" is of recent vintage. Since the legislature has concluded that the code's provisions effectuate economic justice in today's society, the courts are bound by this conclusion. Also, the 1988 amendments to the Divorce Code which strengthen its alimony provisions reaffirm the legislature's commitment to effectuating economic justice between the parties upon divorce.

Because of Pennsylvania's strong public policy of effectuating economic justice between parties who are divorced and mitigating the harm caused by the dissolution of the marriage, we will follow the line of cases which most carefully scrutinizes the provisions of antenuptial agreements governing support and property rights upon divorce.

With respect to alimony, we will follow the case law holding that the agreement must be fair and reasonable at the time of the proceedings at which alimony is sought.

With respect to equitable distribution, we will also use a conscionability standard. The agreement must be fair, in light of the circumstances, at the time of execution. Also, at the time of the proceedings at which equitable distribution is sought, the agreement must not provide a result which was beyond the expectations of the parties as of the date that the agreement was made. In determining whether an agreement governing the distribution of marital property is conscionable, we find the ap-

proach proposed by the Wisconsin Supreme Court in *Button v. Button, supra,* to be instructive:[3]

"To meet the requirement of substantive fairness an agreement need not divide the property in conformity with how a divorce court would divide the property, but it should in some manner appropriate to the circumstances of the parties take into account that each spouse contributes to the prosperity of the marriage by his or her efforts.

"In framing the agreement the parties should consider the circumstances existing at the execution of the agreement and those reasonably foreseeable. The parties should consider that the duration of the marriage is unknown and that they wish the agreement to govern their financial arrangements whether the marriage lasts a short time or for many years. The parties should consider such factors as the objectives of the parties in executing an agreement, the economic circumstances of the parties, the property brought to the marriage by each party, each spouse's family relationships and obligations to persons other than to the spouse, the earning capacity of each person, the anticipated contribution by one party to the education, training or increased earning power of the other, the future needs of the respective spouses, the age and physical and emotional health of the parties, and the expected contribution of each party to the marriage, giving appro-

---

3. We cite this case only for the issue of the standards that a court should apply in determining whether an agreement is substantively fair. The issue of whether or not a court will review the substantive fairness of an agreement is governed by the Wisconsin Divorce Code which provides that a prenuptial agreement will not be binding if its terms are inequitable as to either party.

priate economic value to each party's contribution in homemaking and child care services.

"In assessing the fairness of the substantive terms of the agreement, a circuit court considers these factors and evaluates the terms of the agreement from the perspective of the parties at the execution of the agreement. We conclude that the court should look at the substantive fairness of the agreement as of the time it was made if the court is to give effect to the parties' freedom to contract. At execution the parties know their property and other relevant circumstances and are able to make reasonable predictions about the future; they should then be able to draft a fair agreement considering these factors. (footnote omitted)

"Clearly an agreement fair at execution is not unfair at divorce just because the application of the agreement at divorce results in a property division which is not equal between the parties or which a court might not order under §767.255. If, however, there are significantly changed circumstances after the execution of an agreement and the agreement as applied at divorce no longer comports with the reasonable expectations of the parties, an agreement which is fair at execution may be unfair to the parties at divorce." 388 N.W. 2d at 551-2.

We recognize that through section 401(e)(2) of the Divorce Code (which excepts "property excluded by valid agreement of the parties entered into before, during or after the marriage" from the definition of marital property) the legislature has recognized that an antenuptial agreement can serve a useful function. The established public policy of permitting a spouse to protect separate property brought to the marriage or acquired by gift or inheritance during the marriage is the apparent basis

for this section. While the Divorce Code already excludes this property from equitable distribution, it does not exclude increases in value during the marriage or separate property that has been comingled. The typical antenuptial agreement will cover these situations.

We find no merit to the argument that section 401(e)(2) immunizes from judicial scrutiny all provisions in an antenuptial agreement governing equitable distribution. Such a broad reading of section 401(e)(2) is inconsistent with the legislative policy of the Divorce Code as expressed in section 102 and ignores the legislative history which shows that the no-fault divorce was intended to be encumbered with those provisions protecting economically needy spouses and recognizing non-monetary contributions to the marriage. Finally, the language of section 401(e)(2) which speaks in terms of excluding property—as opposed to waiving rights to equitable distribution—also supports the position that the legislative purpose of this subsection was not to permit a party to waive generally the equitable distribution rights provided for in the Divorce Code.

We now apply the law set forth in this opinion to the August 19, 1981 antenuptial agreement.

### A.

We find no merit to the wife's contention that the agreement should be set aside on the grounds that (1) the husband failed to make a full and fair disclosure of his financial worth or (2) that the wife did not knowingly and voluntarily enter into the agreement. The exhibits attached to the antenuptial agreement disclose the husband's financial worth and income. While these exhibits fail to list a stamp collection and a coin collection, we accept as true

the testimony of the husband that prior to signing the agreement, the wife was aware of these collections and that these were included under the reference to personal effects located at the 125 Bartley Road residence. Moreover, there has been no showing that these assets are valuable. Also, we find no merit to the wife's contention that there was no full or fair disclosure because of the husband's failure to disclose accounts of his parents which he managed. On the basis of the testimony offered by the husband, we find that these accounts were assets of his parents and, thus, were not part of his financial worth.

We also find no merit to the wife's contention that the agreement must be set aside under traditional contract principles of fraud and duress. While it is true that the husband was not prepared to marry the wife until the antenuptial agreement was executed, the wife was aware of this requirement many months before the marriage. During this time, she spoke to two attorneys about the agreement. Also, we believe the testimony of the husband that he had informed the wife that there was no deadline by which the agreement had to be signed—he would marry her whenever she decided to sign the agreement.

### B.

At this time, we cannot dismiss the wife's claim for alimony on the basis of the provisions in the antenuptial agreement waiving rights to alimony. At the hearing on the wife's claim for alimony, we will look to the factors set forth in section 501 of the Divorce Code to determine (1) whether she is entitled to alimony and (2) if so, whether the enforcement of the agreement would create a unjust result.

## C.

We cannot dismiss any of the wife's claims for equitable distribution on the basis of the antenuptial agreement waiving all rights to equitable distribution. However, at the hearing on the equitable distribution claim we will enforce the agreement unless the wife can show that the agreement was unfair at execution or, if fair at execution, that there are significant changed circumstances which would render the agreement unfair as of the date of the hearing.

For these reasons, we enter the following

## ORDER OF COURT

On March 18, 1988, it is hereby ordered, adjudged, and decreed that:

(1) The August 19, 1981 antenuptial agreement shall not be set aside on the grounds that the husband failed to disclose financial worth or that the agreement was not knowingly, voluntarily, and intelligently entered into.

(2) The husband's request that the alimony claim be dismissed on the basis of the August 19, 1981 antenuptial agreement is denied without prejudice to the husband to raise the agreement as a defense at the hearing on the wife's claims for alimony.

(3) The husband's request that the wife's claims for equitable distribution be dismissed on the basis of the August 19, 1981 antenuptial agreement is denied without prejudice to the husband to raise the agreement as a defense at the hearing on these claims.

(4) A conciliation on the wife's claims for equitable distribution and alimony is scheduled before this member of the court on April 18, 1988, at 10:00 a.m.