GROSS, APPELLEE, *v.* GROSS, APPELLANT.

[Cite as Gross *v.* Gross (1984), 11 Ohio St. 3d 99.]

(No. 83-564—Decided June 13, 1984.)

*Messrs. Brownfield, Bowen & Bally, Mr. C. William Brownfield* and *Mr. William H. Arnold,* for appellee.

*Murphey, Young & Smith Co., L.P.A., Mr. Alan L. Briggs, Mr. Geoffry V. Case* and *Mr. George W. Gross,* for appellant.

HOLMES, J. An antenuptial agreement is a contract entered into between a man and a woman in contemplation, and in consideration, of their future marriage whereby the property rights and economic interests of either the prospective wife or husband, or both, are determined and set forth in such instrument. These agreements may include: provisions concerning the disposition or devolution of property and payments for sustenance upon the death of one of the spouses; provisions for the distribution of property and the sustenance or maintenance of one or other of the spouses, most usually the wife, upon a separation or divorce; or a combination of all of these concerns between the parties.[1]

Historically, there has been a notable contrast between the views taken by courts in this country of provisions within antenuptial agreements setting forth the division of property and other rights and interests upon the death of one of the parties, contrasted to provisions in such agreements providing for, or affecting, property rights or conjugal and marital rights in the event of divorce.[2] In the majority of jurisdictions, prospective spouses could contract as to the division of their property in the event of the death of one of the parties, and these agreements were generally enforced if the parties made a full

---

[1] Note, The Antenuptial Contract in Ohio (1978), 28 Case W. Res. L. Rev. 1040.

[2] Klarman, Marital Agreements in Contemplation of Divorce (1977), 10 U. Mich. J.L. Ref. 397.

disclosure of their assets and there was no showing of fraud, duress, or undue influence in the procurement of the agreement. Such provisions in an antenuptial agreement were generally recognized as being conducive to marital tranquility, and thus in harmony with public policy. *In re Estate of Lopata* (Colo. 1982), 641 P. 2d 952; *Remington v. Remington* (1920), 69 Colo. 206, 193 P. 550; *Del Vecchio v. Del Vecchio* (Fla. 1962), 143 So. 2d 17; *Seuss v. Schukat* (1934), 358 Ill. 27, 192 N.E. 668; *In re Estate of Muxlow* (1962), 367 Mich. 133, 116 N.W. 2d 43.

In upholding such agreements concerning the disposition of property upon the death of one spouse, the courts have generally alluded to factors such as the spouses' interest in the preservation of their respective estates,[3] and their reasonable desire to avoid disputes regarding such property after one spouse has died.

While the specific question of the validity of provisions in antenuptial agreements pertaining to the division of property, and proposed settlement of conjugal property rights upon a divorce is one of first impression before this court, the public policy of premarital agreements regarding the disposition of property upon the death of a spouse has been addressed by this court a significant number of years ago. The first reported case of this court which recognized the validity of an antenuptial agreement concerning the disposition of property upon the death of one of the parties was that of *Stilley v. Folger* (1846), 14 Ohio 610. More recent cases have upheld antenuptial agreements regarding disposition of property at the death of the husband even though the provisions made for his surviving spouse were wholly disproportionate. *Hook v. Hook* (1982), 69 Ohio St. 2d 234 [23 O.O.3d 239]; *Troha v. Sneller* (1959), 169 Ohio St. 397 [8 O.O.2d 435]; *Juhasz v. Juhasz* (1938), 134 Ohio St. 257 [12 O.O. 57].

As noted previously, courts throughout the country have historically taken a significantly different attitude toward provisions in antenuptial agreements providing for a division of property and sustenance alimony upon the divorce of the parties. The prevailing law in the United States was that such contracts were considered as being made in contemplation of divorce and were held to be void as against public policy. *In re Marriage of Gudenkauf* (Iowa 1973), 204 N.W. 2d 586; *Crouch v. Crouch* (1964), 53 Tenn. App. 594, 385 S.W. 2d 288; *Caldwell v. Caldwell* (1958), 5 Wis. 2d 146, 92 N.W. 2d 356; *Fricke v. Fricke* (1950), 257 Wis. 124, 42 N.W. 2d 500; see, also, cases cited in Annotation (1931), 70 A.L.R. 826, and Annotation (1935), 98 A.L.R. 533.

Generally, two basic policy arguments were advanced for the invalidation of provisions in antenuptial agreements in reference to the divorce of the

---

[3] Records quite often show that parties to antenuptial agreements have previously been married and have children by the prior marriage. The provisions of the agreement generally provided for, and hopefully ensure, the distribution of estate property to children of the prior marriage.

parties. First, provisions in such contracts which provide for one spouse to forfeit marital property or conjugal rights are potentially profitable to the other party, would encourage divorce and, therefore, would be contrary to the state's interest in preserving the marriage. Second, the state is virtually a party to every marital contract in that it possesses a continuing concern in the financial security of divorced or separated persons.[4]

In the last decade and a half many changes have taken place in the attitudes and mores surrounding marriage and marital relationships. These changes have altered the public policy view toward antenuptial agreements made in contemplation of a possible divorce. Some of the factors involved within this evolution of policy are the social changes which affect family law in general, such as the greater frequency of divorce and remarriage, the percentage drop in marriage generally among our citizens, the adoption by a number of states of all or a number of the provisions of the Uniform Marriage and Divorce Act and, most significantly, the widespread adoption of some manner of "no fault" divorce laws.[5] In this latter respect, Ohio adopted the Divorce Reform Act of 1974 which provides a form of "no fault" divorce where the parties may seek a dissolution of their marriage by reducing to writing in a separation agreement their understanding as to matters of custody, child support, visitation rights, alimony, and property division. R.C. 3105.63.

Exemplary of this trend among the states to reconsider the common-law position or rule of law, which disfavors agreements providing for division of property and sustenance provisions upon divorce, is the often cited case of *Posner* v. *Posner* (Fla. 1970), 233 So. 2d 381. The Florida Supreme Court held that antenuptial agreements settling alimony and property rights upon divorce should not be held void *ab initio* as contrary to public policy. The court adopted the same tests which had previously been applied for the determination of the validity of antenuptial agreements containing provisions disposing of property at time of death, *i.e.*, a showing of good faith in the entry into the agreement, and a full disclosure of assets. The court also held that upon evidence of changed circumstances, the contract would be subject to the same modification provisions that apply to all support orders in divorce proceedings.

A number of courts in other states followed the lead of *Posner* and held that this type of antenuptial agreement was valid if fairly negotiated upon a full disclosure of assets. *Newman* v. *Newman* (Colo. 1982), 653 P. 2d 728; *Volid* v. *Volid* (1972), 6 Ill. App. 3d 386, 286 N.E. 2d 42; *Unander* v. *Unander* (1973), 265 Ore. 102, 506 P. 2d 719. In *Newman,* the Supreme Court of Colorado held that antenuptial agreements dealing with the division of property upon divorce should be analyzed the same as agreements providing

---

[4] 2 Lindey, Separation Agreements and Ante-nuptial Contracts (Rev. Ed. 1983).

[5] Note, For Better or For Worse . . . But Just in Case, Are Antenuptial Agreements Enforceable? 1982 U. Ill. L. Rev. 531.

for property division at death so long as the same good faith and full disclosure tests are met. The court further held that the division of *property* as set forth in such agreements should not be invalidated or altered by a trial judge at any later time unless the spouse seeking to invalidate the agreement can demonstrate nondisclosure, fraud or overreaching at the time of making the agreement.

In *Newman,* the court adopted the general view that provisions pertaining to *maintenance alimony* of the wife upon divorce would be lawful if they met the same tests of good faith, full disclosure and absence of overreaching. However, the court held that even though valid at the inception of the agreement, changed circumstances of the parties may give rise for a trial court to amend this type of provision in the contract.

Upon a review of all of the public policy factors presented, we conclude that the modern trends of marriage and divorce across the country dictate that reasonable laws must be forthcoming to accommodate these changing social attitudes. It may be reasonably concluded that these types of agreements tend to promote or facilitate marriage, rather than encourage divorce.

We, therefore, join those other jurisdictions that have expressed the growing trend of legal thought in this country that provisions contained within antenuptial agreements providing for the disposition of property and awarding sustenance alimony upon a subsequent divorce of the parties are not void *per se* as being against public policy. We hold that such agreements are valid and enforceable if three basic conditions are met: one, if they have been entered into freely without fraud, duress, coercion or overreaching; two, if there was a full disclosure, or full knowledge, and understanding, of the nature, value and extent of the prospective spouse's property; and, three, if the terms do not promote or encourage divorce or profiteering by divorce.

The elements of the first condition may be read with their generally accepted meaning being applicable. Accordingly, the term "overreaching" is used in the sense of one party by artifice or cunning, or by significant disparity to understand the nature of the transaction, to outwit or cheat the other.

The elements of the second condition would be satisfied either by the exhibiting of the attachment to the antenuptial agreement of a listing of the assets of the parties to the agreement, or alternatively a showing that there had been a full disclosure by other means.

A hypothetical example of the type of situation which condition three seeks to avoid is where the parties enter into an antenuptial agreement which provides a significant sum either by way of property settlement or alimony at the time of a divorce, and after the lapse of an undue short period of time one of the parties abandons the marriage or otherwise disregards the marriage vows.

We are called upon to answer other important questions in this case. One is whether fault on the part of one of the parties, which occasions a divorce, invalidates the agreement, or at least vitiates the terms of the contract as to

the one at fault. As to this query, the court of appeals here held that the law of Ohio had been previously pronounced by this court in *Southern Ohio Savings Bank & Trust Co.* v. *Burkhart* (1947), 148 Ohio St. 149 [35 O.O. 166].[6] In *Burkhart*, the facts show that the parties had been twice married to each other and twice divorced. Prior to the second marriage, an antenuptial agreement was executed which provided that the husband would make a will providing for $300 per month support during the wife's lifetime, plus $1,000 per year for five years, in consideration of her agreement to waive her statutory rights of inheritance. It appears that the parties remarried and remained so for some thirteen years, when the husband obtained a divorce based upon the wife's gross neglect of duty. Two years later, the husband died. The former wife filed a claim against the executor of the husband's estate, seeking enforcement of the support provisions contained in the antenuptial agreement. The probate court held that the former wife could not enforce the contract. The court of appeals affirmed. Upon review, this court affirmed, holding that:

"A former wife may not enforce the performance of an antenuptial contract which she herself has failed and refused to perform."

It must be noted that *Burkhart* involved the construction of an antenuptial agreement made in contemplation of death. It did not involve an antenuptial agreement containing provisions for the distribution of property or the award of sustenance alimony upon a divorce or dissolution of the parties. The cases cited by this court in *Burkhart* concerned the construction of certain provisions within antenuptial agreements made in contemplation of death — not in regard to a possible divorce of the parties.[7] The court, within the context of those facts, stated at page 152:

"In the instant case the rights the wife agreed to relinquish were those of a surviving spouse. But at the time her former husband died she was not his wife, and hence had no rights as a surviving spouse to relinquish in consideration for the sums she now claims from his estate. Under the terms of the antenuptial contract it was contemplated that she should remain his wife and perform the marriage obligations of a wife as long as he and she lived. * * *"

We are in agreement with this statement and with the judgment in *Burkhart*; however, the law emanating from that case seems to have been based upon a multi-faceted foundation. The syllabus law of the case, and a portion of the discussion of the court in the opinion, premised the holding upon the basis that the errant wife could not benefit from the estate of her

---

[6] The court of appeals also cited the cases of *Kennedy* v. *Kennedy* (1919), 11 Ohio App. 399; and *Dearbaugh* v. *Dearbaugh* (1959), 110 Ohio App. 540 [13 O.O.2d 351]. These cases held that the party found at fault during the divorce proceeding had in effect repudiated the antenuptial agreements made in contemplation of a divorce, and therefore could not rely upon the terms of the contracts.

[7] *Becker* v. *Becker* (1909), 241 Ill. 423, 89 N.E. 737; *York* v. *Ferner* (1882), 59 Iowa 487, 13 N.W. 630; *Veeder* v. *Veeder* (1923), 195 Iowa 587, 192 N.W. 409, 29 A.L.R. 191; *New Jersey Title Guaranty & Trust Co.* v. *Parker* (1916), 85 N.J. Eq. 557, 96 A. 574.

former husband in that she had vitiated the marriage contract by her own actions and hence violated the antenuptial contract. As previously set forth, the court also utilized language in the opinion to the effect that inasmuch as there had been a prior divorce, she had no status as a surviving spouse at the time of presenting her claim, and that the parties had included provisions for support of the wife only in the event that the parties were husband and wife at the time of the husband's death. The latter was the reasoning of the probate court which held the agreement was abrogated by the prior divorce.[8] To base the abrogation of the antenuptial agreement upon the prior divorce of the parties, rather than upon the fault of one of the parties, would have been a more viable foundation upon which to have determined the issues in *Burkhart.*

Upon our considered view and analysis of the very specialized purpose of these types of agreements, *i.e.,* the disposition of property, and provision for support or sustenance alimony at the time that a divorce or separation might take place between the parties, we conclude that a strict application of the law of contracts would not be appropriate. The terms of the instrument are not the only important factors to be considered; the intent of the parties at the time of the execution of the agreement is also of prime importance. The parties here, and others who enter into such instruments, specifically provide for a possible "parting of the twain" by way of divorce or separation. It would seem that some misconduct was contemplated at that time. If there would be no basic circumstance present which could occasion a separation or divorce of the parties, how could the provisions in the contemplated contract ever be meaningful as to either party? Any other view taken of such agreements would undermine and render inane the basic purpose of such agreements. If the parties had intended that the subsequent marital misconduct would extinguish the mutual promises in the agreement, either voiding the provisions or permitting only the one not at fault to enforce such provisions, the parties could very well have made this clear within the terms of the agreement.

Although there seems to be a notable difference of positions across the country upon this issue, there are a number of jurisdictions which hold that antenuptial agreements containing provisions for property distribution or sustenance allowance are not abrogated, nor held to be unenforceable by the party found to be at fault in a divorce proceeding, unless the language of the contract contains an express provision against such conduct. *Maloy* v. *Maloy*

---

[8] Probate Judge Frank Bonham of Hamilton County stated in his opinion regarding this point: "All these rights she was agreeing to relinquish were the rights of a surviving spouse — those rights, titles and interests she would acquire in his estate, only in the event she married him, and remained his wife until his death. In no other way could she be his surviving spouse at his death. Those rights would then be determined by the law of his domicile in effect at his death. If, at his death, she did not have these rights to relinquish, there was no consideration for his agreement to pay to her the sums he agreed to pay." *Southern Ohio Savings Bank & Trust Co.* v. *Burkhart* (May 1, 1946), No. 30909, unreported.

(Fla. App. 1978), 362 So. 2d 484; *Crise* v. *Smith* (1926), 150 Md. 322, 133 A. 110; *Sims* v. *Sims* (1971), 186 Neb. 780, 186 N.W. 2d 491.

The enactment in a number of states of so-called "no fault" divorce laws, in conformity with the Uniform Marriage and Divorce Act, ameliorated, if not eliminated, the traditional concept that divorce is a remedy granted to an innocent spouse based upon the marital fault of the other spouse. These types of statutes provide the so-called pure "no fault" divorce laws. The Ohio General Assembly did not see fit to go quite so far when it passed the Divorce Reform Act of 1974. The Ohio Act, by way of R.C. 3105.61 *et seq.*, provides for the dissolution of the marriage by agreement of the parties which is a form of "no fault" divorce, but it requires a written agreement of the parties regarding custody of any children of the parties, child support, visitation rights, alimony and property division. The Act repealed the common-law defenses of condonation and recrimination, the latter defense being grounded upon the premise that a party seeking a divorce could not obtain one unless he himself was free of fault. Although the Ohio Act does not eliminate the laws relating to divorce based upon fault of one party that are set forth in R.C. 3105.01,[9] the new Act is a further legislative recognition of the right of married parties to contract regarding a breakdown of a marriage, as had been previously recognized in R.C. 3103.06, with reference to separation agreements and, in both areas, without any regard to the element of fault.

As to this issue, we conclude the better view to be, and so hold, that antenuptial agreements providing for division of property and containing provisions for sustenance alimony, if otherwise found to be valid, are not abrogated as to either party for marital misconduct arising after the marriage.

Having determined the general validity of antenuptial agreements providing for the disposition and division of property and allowing for sustenance or maintenance at the time of a divorce of the parties, we must now provide for the standards of judicial review of such agreements.

At the outset it must be restated that upon a judicial review of any such agreement, it must meet the general tests of fairness as referred to previously, and must be construed within the context that by virtue of their anticipated marital status, the parties are in a fiduciary relationship to one another. The parties must act in good faith, with a high degree of fairness and disclosure of all circumstances which materially bear on the antenuptial agreement.

Upon the consideration of provisions relating to the division or allocation of *property* at the time of a divorce, the applicable standards must relate back to the time of the execution of the contract and not to the time of the divorce. As to these provisions, if it is found that the parties have freely entered into an antenuptial agreement, fixing the property rights of each, a

---

[9] It should be noted that one of the "grounds" for divorce to be found in R.C. 3105.01 has no element of fault, *i.e.*, living apart for one year without interruption and no cohabitation.

court should not substitute its judgment and amend the contract. A perfect or equal division of the marital property is not required to withstand scrutiny under this standard. This is in keeping with this court's standard of review of provisions contained in antenuptial agreements providing for the devolution of property at the time of the death of one of the parties. *Hook, supra*; *Troha, supra*; *Juhasz, supra.*

In the review of provisions in antenuptial agreements regarding *maintenance or sustenance* alimony, a further standard of review must be applied — one of conscionability of the provisions at the time of the divorce or separation. Although we have held herein that such provisions in an antenuptial agreement generally may be considered valid, and even though it is found in a given case upon review that the agreement had met all of the good faith tests, the provisions relating to maintenance or sustenance may lose their validity by reason of changed circumstances which render the provisions unconscionable as to one or the other at the time of the divorce of the parties. Accordingly, such provisions may, upon a review of all of the circumstances, be found to have become voidable at the time of the divorce or dissolution.[10]

We believe that the underlying state interest in the welfare of the divorced spouse, when measured against the rights of the parties to freely contract, weighs in favor of the court's jurisdiction to review, at the time of a subsequent divorce, the terms in an antenuptial agreement providing sustenance alimony for one of the parties. There is sound public policy rationale for not strictly enforcing such a provision which, even though entered into in good faith and reasonable at the time of execution, may have become unreasonable or unconscionable as to its application to the spouse upon divorce. It is a valid interest of the state to mitigate potential harm, hardship, or disadvantage to a spouse which would be occasioned by the breakup of the marriage, and a strict and literal interpretation of the provisions for maintenance of the spouse to be found in these agreements.

One who, by way of a motion for modification, claims the unconscionability of a provision for maintenance within an antenuptial agreement has the burden of showing the unconscionable effect of the provision at the time of divorce or dissolution.[11] The trial court, in the determination of the issue of conscionability and reasonableness of the provisions for sustenance or

---

[10] We are not called upon here to decide, nor do we decide, whether the trial court has continuing jurisdiction, subsequent to divorce, relative to the amount of alimony ordered pursuant to a conscionability hearing. However, the underlying rationale of *Wolfe* v. *Wolfe* (1976), 46 Ohio St. 2d 399 [75 O.O.2d 474], regarding the breadth of the overview of the trial court in matters of alimony considerations may arguably be applicable to these matters.

[11] Unconscionability of a provision for maintenance and sustenance contained in an antenuptial agreement may be found in a number of circumstances, examples of which might be an extreme health problem requiring considerable care and expense; change in employability of the spouse; additional burdens placed upon a spouse by way of responsibility to children of the parties; marked changes in the cost of providing the necessary maintenance of the spouse; and changed circumstance of the standards of living occasioned by the marriage, where a return to the prior living standard would work a hardship upon a spouse.

maintenance of a spouse at the time of the divorce, shall utilize the same factors that govern the allowance of alimony which are set forth in R.C. 3105.18.[12]

Applying the law to the facts and circumstances of this case, we find that there is accord that the antenuptial agreement was entered into with all of the factors of good faith and non-overreaching as previously set forth herein. There also is no question that there was in fact a full disclosure of the assets of the parties as evidenced by the list of such assets attached to the agreement. Further, we believe that the provisions of the contract did not promote or encourage divorce, or present a profiteering device for the parties. Here, we are reviewing an antenuptial agreement entered into by the parties who married and lived together as man and wife for fourteen years, which marriage must have been a harmonious one for a considerable period of time, and one which produced an offspring.

Therefore, the basic agreement in its totality was a valid one when entered into by the parties. In accord with the principles discussed previously, the fact that a divorce was granted to the wife upon the trial court's finding that the husband had been at fault does not abrogate the contract upon which he relies, and does not prevent the husband from enforcing the provisions other than those pertaining to sustenance or maintenance which might be held voidable on behalf of the wife.

Concerning the latter point, the facts would tend to show that, although a comparatively wealthy man at the time of the execution of the antenuptial agreement, Mr. Gross became a man of considerably greater means during the years of his second marriage. Not only did his stock holdings and value thereof increase markedly, but his net income also substantially increased. The wife's standard of living has changed quite dramatically from the time of the execution of the agreement until the time of the divorce. To require the wife to return from this opulent standard of living to that which would be required within the limitations of the property and sustenance provisions of this agreement, could well occasion a hardship or be significantly difficult for the former wife.

---

[12] R.C. 3105.18(B) provides:

"In determining whether alimony is necessary, and in determining the nature, amount, and manner of payment of alimony, the court shall consider all relevant factors, including:

"(1)  The relative earning abilities of the parties;

"(2)  The ages, and the physical and emotional conditions of the parties;

"(3)  The retirement benefits of the parties;

"(4)  The expectancies and inheritances of the parties;

"(5)  The duration of the marriage;

"(6)  The extent to which it would be inappropriate for a party, because he will be custodian of a minor child of the marriage, to seek employment outside the home;

"(7)  The standard of living of the parties established during the marriage;

"(8)  The relative extent of education of the parties;

"(9)  The relative assets and liabilities of the parties;

"(10)  The property brought to the marriage by either party;

"(11)  The contribution of a spouse as homemaker."

Under the facts here, and in light of the law pronounced in this opinion, we find the provisions for maintenance within this agreement to be unconscionable as a matter of law and voidable by Mrs. Gross. Accordingly, we hold that the provisions within this agreement for the maintenance of Mrs. Gross should be reviewed by the trial court, and alternative provisions be ordered by the court.

Accordingly, the judgment of the court of appeals is reversed, and this cause is remanded to the trial court for further proceedings in accordance with this opinion.

*Judgment reversed*
*and cause remanded.*

W. BROWN, SWEENEY and LOCHER, JJ., concur.

CELEBREZZE, C.J., C. BROWN and J. P. CELEBREZZE, JJ., concur in part and dissent in part.

J. P. CELEBREZZE, J., concurring in part and dissenting in part. Justice Holmes has provided a cogent analysis of the societal changes which dictate that this court adopt a new rule of law recognizing the general validity of divorce-operative antenuptial agreements. This decision will tend to mitigate many of the difficulties often associated with a divorce. It allows the parties to plan their own affairs with a minimum of governmental intrusion, yet denies enforcement of any support or maintenance agreement which would work a great injustice.

As to the general validity of antenuptial agreements, and as to conscionability review of support provisions, I wholeheartedly concur. However, I must respectfully part from the path chosen by the majority which would allow enforcement of unconscionable property settlements.

The traditional justification for the *per se* invalidity of divorce-operative antenuptial agreements was that the potential for economic gain would encourage divorce.[13] The continued validity of this supposition has been routinely attacked by the commentators.[14] The Supreme Court of Colorado has rejected the traditional argument, and stated, "it is unlikely that an otherwise viable marriage would be destroyed because of the potential for economic gain through enforcement of the terms of the antenuptial agreement." *Newman* v. *Newman* (Colo. 1982), 653 P. 2d 728, 732. This court now joins the growing number of progressive jurisdictions which have recognized

---

[13] Clark, Antenuptial Contracts (1979), 50 U. Colo. L. Rev. 141.

[14] Moore, The Enforceability of Premarital Agreements Contingent Upon Divorce (1983), 10 Ohio N.U.L. Rev. 11; Note, The Antenuptial Contract in Ohio (1978), 28 Case W. Res. L. Rev. 1040; Klarman, Marital Agreements in Contemplation of Divorce (1977), 10 U. Mich. J. L. Ref. 397; Note, For Better or For Worse . . . But Just in Case, Are Antenuptial Agreements Enforceable? 1982 U. Ill. L. Rev. 531; Clark, Antenuptial Contracts, *supra*.

that antenuptial agreements do not automatically lead to divorce, but rather may lead to a greater number of harmonious marriages.

While holding that antenuptial agreements are presumptively valid, the majority recognizes that there are limitations to their enforceability. As Justice Holmes states, in quoting from *Newman* v. *Newman, supra,* at 734, "the provisions relating to maintenance or sustenance may lose their validity by reason of changed circumstances which render the provisions unconscionable as to one or the other at the time of the divorce of the parties." The majority holds, however, that provisions regarding division of property may not be attacked or invalidated for unconscionability.[15]

Antenuptial agreements often provide that each party waives any rights he or she may have in property brought to the marriage by the other. Often, as is the case herein, a party wishes to pass certain property to his or her children from a prior marriage, and thus desires that it not be subject to any potential claim.[16] An agreement which waives any claim to such property, accumulated prior to the marriage, through no effort of the waiving spouse, would not be unconscionable. *Matlock* v. *Matlock* (1978), 223 Kan. 679, 576 P. 2d 629. However, an agreement which waives any claim of a spouse to property acquired during the marriage, regardless of that spouse's contribution, or any other circumstance, may be unconscionable. *Ranney* v. *Ranney* (1976), 219 Kan. 428, 548 P. 2d 734.

In *Ranney,* the parties voluntarily entered into an antenuptial agreement which was fairly and understandably made after full disclosure. The Supreme Court of Kansas held that such agreements were not contrary to public policy and should be liberally construed so as to uphold their validity. The court went on to hold, however, that the particular agreement at issue, which would leave the ex-wife with a house and a car, but with no part of the assets acquired through the parties' joint efforts during the eleven-year marriage,

---

[15] The majority states that this bar to unconscionability review would be consistent with the standard of review for antenuptial agreements effective at the death of one of the parties. However, none of the cited cases stands for such a proposition. In *Juhasz* v. *Juhasz* (1938), 134 Ohio St. 257 [12 O.O. 57], this court held in paragraph two of the syllabus:

"An antenuptial contract voluntarily entered into during the period of engagement is valid when the provision for the * * * [spouse] is fair and reasonable under all the facts and circumstances."

Under this standard, it would still be possible for a person to receive a disproportionately small share of the spouse's estate, but only if it would be fair and reasonable under the facts and circumstances. Such circumstances may exist when the disinherited spouse has substantial wealth of his or her own and the deceased spouse had children from a prior marriage who would be natural claimants to his or her bounty. See *Hook* v. *Hook* (1982), 69 Ohio St. 2d 234 [23 O.O.3d 239]; *Troha* v. *Sneller* (1959), 169 Ohio St. 397 [8 O.O.2d 435].

In *Hook* v. *Hook, supra,* this court recently reaffirmed the *Juhasz* requirement that antenuptial agreements regarding disposition of property at death be fair and reasonable under the circumstances. It would seem incongruous to suggest, as does the majority, that enforcement of unconscionable agreements would be consistent with the invalidation of those that are unfair or unreasonable.

[16] Note, The Antenuptial Contract in Ohio, *supra.*

was unfair, inequitable, contrary to public policy and unenforceable. *Ranney* at 433.

The archaic notion that the only contributions of any value to a marriage are those of a wage-earning husband, and not those of a homemaker, has long ago been discarded.[17] An antenuptial agreement which would give economic substance to such a sexist concept would certainly be unconscionable and, for a court to enforce it, unjust. Furthermore, it is unclear whether the contract *sub judice* was intended to apply to property acquired during the marriage. At a minimum, any ambiguity in the contract should be construed as intending to divide the assets acquired during the marriage in a manner recognizing the substantial economic value of a homemaker's services, rather than in a manner consistent with a stereotype lacking any rational basis.

The holding of the majority may well lead to illogical results. A spouse who saves little and spends recklessly could not be unconscionably deprived of the "opulent standard of living" to which that spouse had grown accustomed. However, the spouse who had saved diligently and spent only for necessities could be deprived of any claim to the savings regardless of conscionability, and would be entitled only to protection from an unconscionable diminution of such spouse's already frugal life style.

Finally, I would concur in the finding that the support provisions of the present agreement are unconscionable. The record establishes that at the time of the marriage, appellee was employed and self-supporting, but, after fourteen years of dedicated full-time service as a homemaker, is not presently possessed of skills qualifying her for employment outside the home. As to the facts of this case, support payments of $2,400 per year should be held unconscionable as a matter of law.

CELEBREZZE, C.J., and C. BROWN, J., concur in the foregoing opinion.

---

[17] The legislature has recognized the value of the homemaker's contributions in R.C. 3105.18(B)(11) which requires the court to consider the value of such services when determining alimony.