OPINION
Plaintiff-appellee, Nancy L. Wilks, and defendant-appellant, William C. Wilks, were married on September 9, 1995 and divorced on May 10, 1999. Prior to the marriage, Nancy had been a school teacher with the Hamilton City Schools for approximately fourteen years, and Bill had operated his own insurance agency successfully for almost forty years. At the time of the marriage, Nancy was fifty-three and Bill was sixty-four, and both parties had been married before.
On June 30, 1995, in anticipation of their marriage, and while represented by separate counsel of their choice, Nancy and William executed an eight-page prenuptial agreement which provides, in pertinent part, as follows:
C. No Payment of Alimony or Spousal Support
 1. Given the fact that both parties have previously been employed outside the home and their current circumstances, including their relative earning abilities, ages and standards of living, and recognizing that a court of competent jurisdiction may review this provision at a later time, Husband and Wife hereby confirm that it is their intent that in the event of a pre-death divorce, dissolution or other termination of the marriage, neither of them shall pay alimony/spousal support to the other except as provided in C-2 and D-2 below.
 2. In consideration of Wife's waiver of alimony/support and her ceasing to be employed outside of the home at Husband's request, Husband hereby agrees in the event of the pre-death divorce, dissolution or other termination of the marriage, to provide Wife with the following benefits: (I) One Thousand Six Hundred Sixty-seven ($1,667.00) Dollars a month payable upon said filing of divorce, dissolution or other termination of the marriage and upon the first of each month thereafter ending on the Wife's remarriage; (ii) Wife's medical insurance premium per month payable directly to insurer, ending on the earlier of Wife's remarriage, Wife's attaining age sixty-five (65) or Wife's being covered under other medical insurance from other sources, such as employment, except Wife may choose both the benefit contained in this paragraph and the coverage supplied by the employer if the employer's insurance does not cover a pre-existing condition; and (iii) After Wife attains age sixty-five (65), One Thousand Six Hundred Sixty-seven ($1,667.00) Dollars a month, reduced by the dollar amount of any retirement benefits received by Wife from the State Teachers Retirement System payable on the first of each month and the payment of the Wife's medical Medicare insurance, referred to as part "B" and private insurance called "Medigap" to supplement the Medicare coverage, all payable directly to the insurer. The benefits in subparagraph (iii) are for life, ending on the Wife's remarriage. The benefits provided for the Wife in this subparagraph shall continue even after the decease of the Husband, and in the event of the Husband's decease, these benefits shall be a charge upon the Husband's estate, or if none, his revocable trust. Payments made by Husband to Wife under this subsection C-2 are intended to be deductible by Husband as alimony under Section 71 of the Internal Revenue Code of 1986, as may be amended. (Emphasis added.)
Soon after their marriage in September 1995, Mr. and Mrs. Wilks began to experience difficulties, and on June 25, 1996, Nancy Wilks signed a contract to return to the Hamilton Schools for the 1996-1997 school year. Pursuant to her contract, Mrs. Wilks returned to work in September, but during the same month, she caused her doctor to write a medical report indicating she needed a leave of absence, and such leave of absence was officially granted to her on November 18, 1996.
While the request for a leave of absence was pending, Mr. and Mrs. Wilks attempted to reconcile their differences, and in the process, entered into another agreement on October 1, 1996, which provides as follows:
 Whereas, Bill and Nancy are husband and wife and they desire to establish a separate account for Nancy's use and enjoyment;
 Now, therefore, in consideration of the mutual promises herein contained, the parties hereto agree as follows:
 1. After Nancy terminates her present employment, Bill will deposit in Nancy's account the sum of Two Thousand Three Hundred ($2,300.00) Dollars on the first day of each month, prorated for the month she terminates her employment.
 2. Nancy agrees to use the funds for her personal, family or household needs. Personal, family or household needs shall include, but not be limited to, expenditures for the following categories: groceries, gifts (except for Bill's family), her clothing, maid service (if she prefers to employ a maid), and the operating expenses and taxes attributable to her property located at 1309 Cleveland Avenue, Hamilton, Ohio.
 3. Bill's obligation to make the monthly payments to Nancy shall terminate upon the occurrence of any of the following: her death, her re-employment, Nancy moving out of the marital residence, or the filing of an action for divorce, dissolution, legal separation or the like.
Each of the parties performed the terms of this second agreement, but they nevertheless continued to experience problems in their marriage. As a result, Nancy again made arrangements to return to her former position, and she signed a contract with the school district in May 1997. In August 1997, Mrs. Wilks vacated the marital residence and in September 1997, she began working full time once again as a teacher in the public school system.
Thereafter, Mr. and Mrs. Wilks attempted counseling, but they were apparently unable to resolve their differences, and on July 8, 1998, Nancy Wilks filed an action for divorce. In the subsequent decree granting the divorce, the trial court incorporated the provisions of III(C)(2) of the prenuptial agreement and specifically ordered the defendant, Wilks, to pay the plaintiff the sum of $1,667 per month.
In the present appeal, appellant has set forth his only assignment of error as follows:
 The trial court erred to the prejudice of defendant-appellant when it ordered him to make spousal support payments to his wife pursuant to the prenuptial agreement.
At the outset, and with a view to the comprehensive analysis of the trial court, it perhaps should be emphasized that this case involves the interpretation of the language of a prenuptial agreement rather than the application of the equitable principles ordinarily involved in the assessment of spousal support. And as we see it, the language of Article III, Subsection C(2) of the prenuptial agreement makes no reasonable allowance for any construction. Hence, the question presented is whether Mrs. Wilks failed to comply, pursuant to the contract, with the condition precedent to the allowance of alimony. In other words, did the appellee accept employment outside of the home during her marriage?
In this regard, the record discloses that Mrs. Wilks sought a teaching position and was actually employed for a short time during September 1996, but we agree with the trial court that this breach of the condition precedent to her receiving the sustenance award was immaterial as between the parties and completely waived by William Wilks when he entered into another agreement on October 1, 1996, which provided certain amenities for Mrs. Wilks during the marriage.
However, upon reconsideration of the prenuptial agreement, this court has some difficulty with the subsequent finding of the trial court that the marriage of Mr. and Mrs. Wilks terminated de facto at some time prior to September 1997. On the contrary, the evidence reveals that neither of the parties felt that their marriage was over prior to the breach of the agreement to forego work outside the home. In fact, Mrs. Wilks testified specifically as follows:
 Q. Well, you didn't file for a divorce until July of 1998, and that was over a year after you signed the contract to work, isn't that true?
 A. That's true, because we were going to counseling. I wanted the marriage to work.
Likewise, the testimony of Mr. Wilks indicates that the marriage was still ongoing after the departure of appellee from the home:
 Q. So, she had left and gone back to her home on Cleveland Avenue?
 A. Yes.
 Q. Did you continue — did you attempt to keep your marriage together by going to counseling with her?
 A. Yes.
From all appearances, as shown by the evidence, the Wilks' marriage had many divisive interludes from the time of its inception, and the prediction of any terminal date for its duration, other than through divorce proceedings, necessarily would have to be based upon considerable speculation. Furthermore, the record provides no specific evidence that the marriage terminated de facto prior to the breach of the condition precedent set forth in the prenuptial agreement. To the contrary, and much more reliable, in our opinion, was the testimony of the parties themselves, who stated unequivocally that they were still trying to save the marriage after Mrs. Wilks went back to work outside the home.
In the case of Gross v. Gross (1984), 11 Ohio St.3d 99, the second and fourth branches of the syllabus allude to antenuptial agreements as follows:
 2. Such agreements are valid and enforceable (1) if they have been entered into freely without fraud, duress coercion, or overreaching; (2) if there was full disclosure or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce.
* * *
 4. In a judicial review of such an agreement, upon motion for modification at any subsequent separation or divorce proceeding of the parties, provisions setting forth maintenance or sustenance alimony must meet the additional test of conscionability at the time of the divorce or separation.
Here, the agreement was entered into freely after a full disclosure of assets, and nothing appears from the record to suggest that the agreement was designed to encourage profiteering from divorce. Hence, the only remaining issue for determination is whether the provision for maintenance or sustenance alimony was unconscionable as to either or both of the parties at the time of the divorce.
According to the evidence, William Wilks is a man of means, having assets in excess of $3,000,000, whereas Nancy Wilks' contract salary as a teacher at the time of the divorce was about $40,000. However, both parties knew of this disparity in financial resources when the antenuptial agreement was signed. Likewise, appellee must have known, at that time, that her service credit and retirement benefits as a teacher would be affected by any agreement to cease employment outside of the home during the marriage.
Furthermore, another provision of the prenuptial agreement, Section III(D)(2), provides unconditionally that Wilks must pay his wife spousal support of $500 per month for one year from the date she moved out of the residence. Moreover, it may be noted that Mrs. Wilks, in another provision, III(C)(1), expressly waived any claim to alimony-spousal support. Thus, it appears that the contemplated payments under III(C)(2), upon performance of the condition precedent, were more in the nature of a contractual obligation than spousal support.
Upon all of the evidence presented herein, each of the parties reasonably could argue that the other profited or lost the most from the marriage, but the fact that one party profits from a contract to a greater extent than the other does not render it unconscionable. As a matter of fact, the condition imposed by the contract was responsive to previous discussions of the parties while they were engaged, and nothing occurred during the marriage to render the provision unfair and unenforceable.
As heretofore indicated, therefore, the evidence does not support the finding of the trial court that the termination of the marriage predated the breach of the contract. On the contrary, Mrs. Wilks breached the antenuptial agreement before the marriage had ended by vacating the marital residence in August 1997 and resuming full-time employment in September 1997. Hence, appellant is not obligated to pay Mrs. Wilks $1,667 per month as conditionally provided for in the prenuptial agreement. The assignment of error is sustained.
The judgment of the trial court is reversed and the cause is remanded for further proceedings according to law.
YOUNG, P.J., and VALEN, J., concur.
Kerns, J., retired, of the Second Appellate District, sitting by assignment of the Chief Justice, pursuant to Section 6(C), Article IV of the Ohio Constitution.