OPINION
{¶ 1} Defendant-appellant, Carol Hampton n.k.a. Carol Wessell, appeals from a decree issued by the Clermont County Court of Common Pleas, Division of Domestic Relations, granting a divorce to her and her former husband, plaintiff-appellee, Michael A. Hampton.
 {¶ 2} The parties were married on May 16, 1999. There were no children born as *Page 2 
issue of the marriage.[1] Six days prior to their wedding date, the parties executed an antenuptial agreement that provided for the disposition of their property in the event of divorce. After they were married, the parties resided together at appellee's property on State Route 132 in Goshen, Ohio. During their marriage, the parties engaged in a business partnership wherein they provided home restoration services such as constructing outdoor decks and installing home satellite systems.
 {¶ 3} On April 4, 2001, a fire occurred at the residence on St. Rt. 132, which destroyed the garage and its contents. At the time of the fire, the parties had an insurance policy on the residence, and the insurance company paid the parties $139,048 for the loss. Appellee kept the entire amount even though both parties had been named as insureds under the policy. The house was restored with a new configuration; specifically, the garage was replaced with an addition of four new bedrooms.
 {¶ 4} In late October or early November of 2003, appellant left the marital residence, and in December of that year, appellee filed for divorce in the Clermont County Domestic Relations Court. On March 22, 2005, the magistrate issued a decision finding the parties' antenuptial agreement to be valid. The magistrate further stated that "[t]he issue of whether there are some assets as to which the agreement should not be enforced shall be heard at the final property and merits hearing."
 {¶ 5} The final property and merits hearing was held on October 26-27, 2005 and March 2, 2006. On July 24, 2006, the magistrate issued a final decision on the matter, in which the magistrate noted that "[t]he only assets which the parties owned during the marriage, disposition of which was not covered in the Antenuptial Agreement, were some furniture and household goods — nothing that required nearly three days of hearing time." *Page 3 
Consequently, the magistrate awarded appellee $4,357.50 for the attorney fees he incurred from March 2005 through October 2005.[2]
 {¶ 6} On August 7, 2006, appellant filed objections to the magistrate's decision, which she supplemented on November 13, 2006. On December 1, 2006, the trial court issued a decision and entry sustaining three of appellant's objections, overruling the remainder, and modifying the magistrate's decision accordingly. On February 2, 2007, the trial court issued a final divorce decree in the matter, which included a provision requiring appellant to pay appellee $4,357.50 in attorney fees.
 {¶ 7} Appellant now appeals the divorce decree, raising four assignments of error.
 I {¶ 8} Assignment of Error No. 1:
 {¶ 9} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN THE COURT FAILED TO UNDERTAKE AN INDEPENDENT REVIEW OF THE DECISION OF THE MAGISTRATE TO WHICH THE DEFENDANT-APPELLANT OBJECTED."
 {¶ 10} Appellant argues that the trial court erred by failing to take an independent review of the magistrate's decision when it ruled on her objections to it. We disagree with this argument.
 {¶ 11} Civ.R. 53(D)(4)(d) provides in pertinent part that "[i]n ruling on objections [to the magistrate's decision], the court shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and *Page 4 
appropriately applied the law."
 {¶ 12} "The `independent review as to the objected matters' standard is intended to exclude the more limited appellate standards of review and codify the practice approved by most courts of appeals [in this state]." Civ.R. 53 Staff Note: Action of court * * * on any objections to magistrate's decision[.] The Staff Note credits the Second District Court of Appeals with "most clearly and consistently endorsing] and explaining] that standard" in cases like Crosby v. McWilliam, Montgomery App. No. 19856, 2003-Ohio-6063. Crosby states in pertinent part:
 {¶ 13} "When a trial court rules on objections to a magistrate's decision, it `may adopt, reject, or modify the magistrate's decision, hear additional evidence, recommit the matter to the magistrate with instructions, or hear the matter.' [Former] Civ.R. 53(E)(4)(b) [now contained in similarly-worded Civ.R. 53(D)(4)(b)].[3] The trial court has the `ultimate authority and responsibility over the [magistrate's] findings and rulings.' Hartt v. Munobe, 67 Ohio St.3d 3, 5, * * * 1993-Ohio-177. As [the Second District Court of Appeals] has previously stated,
 {¶ 14} "The trial court, as the ultimate finder of fact, must make its own factual determinations through an independent analysis of the issues and should not adopt the findings of the [magistrate] unless the trial court fully agrees with them. The court's role is to determine whether the [magistrate] has properly determined the factual issues and appropriately applied the law, and, where the [magistrate] has failed to do so, the trial court must substitute its judgment for that of the [magistrate].' (Citations omitted.) Inman v. Inman (1995),101 Ohio App.3d 115, 118 * * *. *Page 5 
 {¶ 15} "Hence, because the trial court must conduct a de novo review, `[t]he trial court may not properly defer to the magistrate in the exercise of the trial court's de novo review.' Quick v.Kwiatkowski, Montgomery App. No. 18620, 2001-Ohio-1498."Crosby, 2003-Ohio-6063 at ¶ 33-35.
 {¶ 16} Appellant points out that in overruling many of her objections to the magistrate's decision, the trial court stated that the "objection is not well taken as the Court finds the Decision of the Magistrate to be supported by the evidence presented." She asserts that this language demonstrates the trial court "clearly applied an appellate standard of review," rather than the "independent review" required by Civ.R. 53(D)(4)(d). She also points out that the trial court did not cite any portion of the transcript or any of the numerous exhibits admitted at trial to support its decision. We find these assertions unpersuasive.
 {¶ 17} The fact that the trial court did not cite to any specific portion of the transcript or any exhibit admitted into evidence in this case in overruling appellant's objections to the magistrate's decision does not demonstrate that the court failed to conduct an independent review as to the objected matters as required by Civ.R. 53(D)(4)(d). While citing such material would tend to demonstrate that the trial court conducted the requisite independent review, there is no requirement in Civ.R. 53(D)(4)(d) that the trial court do so.
 {¶ 18} The "appellate standard of review" to which appellant appears to be referring is the standard of review generally used in civil cases where a claim is made that the trial court's judgment is contrary to the manifest weight of the evidence, i.e., "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80, quoting C.E. Morris Co. v. Foley ConstructionCo. (1978), 54 Ohio St.2d 279.
 {¶ 19} At first glance, the trial court's use of the phrase, "[appellant's] objection is not *Page 6 
well taken as the Court finds the Decision of the Magistrate to be supported by the evidence presented," does appear to be similar to the deferential standard of review set forth in cases like Seasons CoalCo. and C.E. Morris Co. The use of such a deferential standard in ruling on appellant's objections to the magistrate's decision would have been error under Civ.R. 53(D)(4)(d). See Crosby, 2003-Ohio-6063 at ¶ 33-35, and Civ.R. 53 Staff Note: Action of court * * * on any objections to magistrate's decision[.]"
 {¶ 20} The trial court did not state that it was affirming the magistrate's decision because it found that the decision was supported by "some competent, credible evidence." Instead, the court merely stated that there was evidence to support the magistrate's decision. This language was not an indication that the trial court wasdeferring to the magistrate's decision but, rather, was simplyagreeing with it. This conclusion is supported by the fact that the trial court sustained several of appellant's objections to the magistrate's decision and modified the decision accordingly.
 {¶ 21} The trial court did not fail in its duty to conduct an independent review of the matters to which appellant objected.
 {¶ 22} Appellant's first assignment of error is overruled.
 II {¶ 23} Assignment of Error No. 2:
 {¶ 24} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT ENFORCED THE TERMS OF THE PARTIES' ANTENUPTIAL AGREEMENT EVEN THOUGH THE EVIDENCE ESTABLISHED THE PARTIES' FAILURE TO COMPLY WITH THE TERMS OF THE AGREEMENT DURING THE MARRIAGE AND EVENTS OCCURING DURING THE MARRIAGE MADE THE ENFORCEMENT INEQUITABLE AND AN ABUSE OF DISCRETION." *Page 7 
 A {¶ 25} Appellant's first argument under this assignment of error is that the trial court erred in enforcing the terms of the parties' antenuptial agreement because appellee breached several terms of the agreement, and failed to act with fairness and in good faith during the marriage. We disagree with this argument.
 {¶ 26} The parties' stated purpose in making their antenuptial agreement was to "waive, renounce, and relinquish any and all rights each may be or become entitled to, under the law, as a spouse and as a surviving spouse in the scheduled property * * * by virtue of entering into the aforesaid proposed marriage[.]"
 {¶ 27} The agreement called for the parties' assets to be listed on schedules and to be treated as follows in the event the marriage was terminated:
 {¶ 28} "2. Treatment of Scheduled Property. All scheduled property, real or personal, tangible or intangible, which each of the parties owned before the parties' proposed marriage, or which each may thereafter acquire through the ownership of such property, including, without limitation, dividends, interest, rents, profits, reinvestments or increments in value thereof, shall be and remain the personal estate of such party, free from any claim whatsoever on the part of the other by way of dower, statutes of descent and distribution, or other applicable laws as though no marriage had been entered into between them.
 {¶ 29} "3. Termination of Marriage. In the event that the parties terminate their contemplated marriage, each party relinquishes all right, interest or claim which he or she may raise against such scheduled property or property acquired as a result of the ownership of such scheduled property, including, but not limited to, any claims for property division or spousal support and each shall limit his or her claims in such an action to marital property acquired as subsequently described herein and the value of scheduled assets or property derived from the ownership thereof shall not be considered in determining the amounts of *Page 8 
such claims through marital assets. Each party agrees that in the event the marriage is terminated no spousal support will be paid by either to the other. Upon the filing of an action for divorce, dissolution or legal separation by either party, [appellant] shall immediately vacate [appellee]'s real estate without the need of further court order or intervention and [appellee] shall immediately vacate [appellant's real estate without the need of further court order or intervention."
 {¶ 30} The agreement, in pertinent part, defined "marital assets" as follows:
 {¶ 31} "6. Marital Assets. All assets acquired solely by either party after marriage shall be the sole property of that party and that party shall also assume sole liability for any debts or other obligations related to the ownership of such property. Such property shall be added to the [schedules] annually as hereinbelow described. For titled property, the name as shown on the title shall be determinative of classification. All property acquired by the parties jointly subsequent to their contemplated marriage which are not derived from scheduled assets, shall be deemed marital assets in which each party has a fifty percent (50%) interest. * * * Each party shall obtain and maintain a life insurance policy with the other as named beneficiary during the period of the marriage in an amount not less than $50,000.00."
 {¶ 32} The agreement also contained a provision that called upon the parties to update their schedules of assets, which stated in pertinent part:
 {¶ 33} "12. Updating Schedules. The parties agree to make good faith efforts to update schedules of assets annually. Likewise, the parties shall prepare, review and amend during January of each year, beginning in 2000, an [exhibit] that shall accurately reflect the extent of their marital assets and liabilities as to which they share equally."
 {¶ 34} An antenuptial agreement is a contract entered into by persons in contemplation of their future marriage, who wish to resolve issues like division of property or spousal support in the event of either spouse's death or the failure of the contemplated *Page 9 
marriage. Gross v. Gross (1984), 11 Ohio St.3d 99, 102.
 {¶ 35} Antenuptial agreements are "valid and enforceable (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce." Id. at paragraph two of the syllabus.
 {¶ 36} In this case, the magistrate, after applying the three-pronged test in Gross, found the parties' antenuptial agreement to be valid. Appellant did not object to that finding in the trial court nor has she challenged it on appeal. In fact, appellant expressly states in her brief that she does not object to the trial court's finding the antenuptial agreement to be valid at the time of its execution; however, she does object to the trial court's application of the terms of the agreement at the time of the divorce.
 {¶ 37} The issue of an antenuptial agreement's fairness at the time ofthe divorce is only relevant to matters involving spousal support. SeeGross at paragraph four of the syllabus (provisions in antenuptial agreement setting forth spousal support "must meet the additional test of conscionability at the time of the divorce"). As to matters involving property division, the only relevant issue is the agreement's fairnessat the time of its execution. See id. at 108-109.
 {¶ 38} As stated in Gross:
 {¶ 39} "Upon the consideration of provisions relating to the division or allocation of property at the time of a divorce, the applicable standards must relate back to the time of the execution of the contract and not to the time of the divorce. As to these provisions, if it is found that the parties have freely entered into an antenuptial agreement, fixing the property rights of each, a court should not substitute its judgment and amend the contract. A perfect or equal division of the marital property is not required to withstand scrutiny under this *Page 10 
standard." (Emphasis sic.) (Citations omitted.) Gross.
 {¶ 40} In this case, spousal support is not an issue between the parties. The parties' antenuptial agreement expressly provides that "[e]ach party agrees that in the event the marriage is terminated no spousal support will be paid by either to the other." In keeping with this provision, the trial court did not order an award of spousal support to either party, and appellant has not challenged this aspect of the trial court's decision.
 {¶ 41} By admitting that the antenuptial agreement was valid at the time of its execution, appellant is prohibited by Gross from challenging the fairness of the antenuptial agreement as it relates to matters regarding the division of the parties' property. See id. at 108-109.
 {¶ 42} Appellant contends that appellee breached the terms of the antenuptial agreement by failing to buy life insurance and by failing to keep updated lists of the parties' assets and, therefore, these breaches should have precluded the trial court from enforcing the agreement. However, the parties were obviously not harmed by their failure to purchase life insurance for each other as neither party died during the course of the marriage. Moreover, the evidence showed that both parties failed to annually update the lists of their assets.
 B {¶ 43} Appellant's second argument under this assignment of error is that the trial court erred in failing to find that the appreciation in the value of the property at St. Rt. 132 should be divided equitably between the parties. Specifically, she contends that while the property may have been appellee's separate property under the terms of the antenuptial agreement since appellee bought the property before they were married, her efforts helped restore the property after it was damaged by fire in April 2001, and marital funds were also used to restore the property. She further contends that her efforts and the use of marital *Page 11 
funds caused the property to increase significantly in value and, therefore, she was entitled to one-half of that increase in value, irrespective of the provisions in the antenuptial agreement. We disagree with this argument.
 {¶ 44} The evidence showed that appellee purchased the property at St. Rt. 132 in August 1996 for $142,000. In September 1998, the property was appraised for $179,000. After the parties were married in May 1999, they used the property as their marital residence. In October 2000, appellee refinanced the mortgage on the property, at which time the property was appraised for $210,000.
 {¶ 45} In April 2001, a fire occurred at the property, destroying the property's garage. The parties received $139,048.48 in insurance proceeds for the damages, which appellee deposited in his account. Appellee testified that his mortgage company required him to repair the house and garage so that after the repairs were made, the property would have at least the same value as before the fire.
 {¶ 46} Appellee rebuilt the house as a duplex, with four additional bedrooms and separate furnaces; however, he ran out of money before he could install another kitchen and bathroom. The parties were able to do some of the repair work on the premises themselves, and appellee testified that appellant was paid for the repair work she performed.
 {¶ 47} In April 2004, the property was listed for sale at $339,500. When the property did not sell at that price, the price was reduced to $279,000, and later still to $269,000, but it still did not sell. The property was then taken off the market. The notes from one of the listing agents who tried to sell the property stated, "this house has several problems: 7 bedrooms, no basement and no garage."
 {¶ 48} Appellee submitted an appraisal indicating the value of the property was $225,000 as of September 2005. He also submitted the Clermont County Auditor's records indicating the value of the property was $269,310 as of October 2005. Appellant submitted *Page 12 
an appraisal indicating the value of the property at St. Rt. 132 was $335,000 as of August 2003.
 {¶ 49} After setting forth the foregoing evidence, the magistrate stated:
 {¶ 50} "[Appellant] testified that the increase in the value of the real estate was due to her work and skill in wiring the house and her skill in rehabilitating homes. The Court finds that the St. Rte. [sic] 132 real estate had a value of $210,000 in October 2000, and a value of $225,000 in September 2005. The Court finds that [Appellant] presented insufficient evidence to sustain her claim that the value of the real estate was increased as a result of her efforts. The repair work from the fire returned the real estate to its previous value. Although the configuration of the house changed, those changes created problems such that the value of the real estate has not increased substantially. The funds for the repairs came from the insurance proceeds. [Appellant] was paid for her work that was invoiced to the insurance company.
 {¶ 51} "The Court finds that [appellee] owned the real estate prior to the parties' marriage, that the real estate was listed in the schedules attached to the Antenuptial Agreement, that the real estate was never titled in any name other than [appellee's], that [appellant] presented insufficient evidence to establish that any increase in the value of the real estate was due to her efforts. Therefore, the Court finds that the real estate located at 6176 St. Rte. [sic] 132, Goshen, Ohio is [appellee's] premarital asset and that, pursuant to the terms of the Antenuptial Agreement, remains [his] asset."
 {¶ 52} Appellant filed objections to this portion of the magistrate's decision, and the trial court overruled them. Upon review of the evidence in the record, we conclude that there is some competent credible evidence to support the trial court's judgment on this matter and, therefore, we will not substitute our judgment for that of the trial court. Seasons Coal Co., 10 Ohio St.3d at 80, quoting C.E. MorrisCo., 54 Ohio St.2d 279. *Page 13 
 {¶ 53} Appellant's second assignment of error is overruled.
 Ill {¶ 54} Assignment of Error No. 3:
 {¶ 55} "IF THE TRIAL COURT INTENDED TO ENFORCE THE TERMS OF THE ANTENUPTIAL AGREEMENT, THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT APPELLANT IN THE DISTRIBUTION OF THE PARTIES' PROPERTY."
 A {¶ 56} Appellant's first argument under this assignment of error is that the trial court erred in finding that appellee should retain a 1989 Pontiac TransAm automobile, because under the terms of the parties' antenuptial agreement, titled property was to remain with the party whose name appears on the title and the evidence at trial showed that in 2002, appellee gifted the vehicle to appellant's minor daughter and transferred title to the vehicle to appellant due to her daughter's status as a minor.
 {¶ 57} In response, appellee concedes that he gifted the vehicle to appellant's daughter and titled the vehicle to appellant during the marriage and, therefore, "does not object to this Court awarding the vehicle to Appellant and/or her daughter."
 {¶ 58} Neither the trial court nor this court has jurisdiction to award the vehicle in question to appellant's daughter since the only issues properly before the trial court and this court pertain to the enforceability of the parties' antenuptial agreement, the division of the parties' marital assets, and the distribution of the parties' separate property. See R.C. 3105.171(C) and (D).
 {¶ 59} Given the terms of the parties' antenuptial agreement and appellee's concession, we conclude the trial court erred by awarding the 1989 Pontiac TransAm to appellee rather than appellant. The trial court should have awarded appellant whatever *Page 14 
interest she may have remaining in the vehicle in light of her ownership through the vehicle's title and in light of the fact that appellee gifted the vehicle to her youngest daughter.
 {¶ 60} Appellant's first argument under this assignment of error is sustained.
 B {¶ 61} Appellant's second argument under this assignment of error is that the trial court erred in failing to award her one-half ofboth loan application refund checks made payable to both parties, which appellee received and cashed. In response, appellee contends that this issue is moot since he has paid appellant one-half of both refund checks prior to the filing of this appeal.
 {¶ 62} Appellant argues in her reply brief that appellee "only reimbursed [her] for the sums the trial court ordered" and that he still owes her $122. However, she asserts that she would not have filed this appeal to seek reimbursement of only $122, and that she is raising this issue merely to support her previous claim in her first assignment of error that the trial court failed to conduct an independent review of the magistrate's decision. She contends that if the trial court had engaged in such a review, it would have sustained her objection to the magistrate's decision on this issue.
 {¶ 63} The fact that the trial court may have overlooked an issue does not establish that the court failed to undertake an independent review of the magistrate's decision in ruling upon appellant's objections to it. As to appellant's claim that she is still owed $122, appellant failed to raise this issue in her objections to the magistrate's decision and has not raised a claim of plain error; therefore, she has waived it for purposes of appeal. See Civ.R. 53(D)(3)(b)(iv) ("Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion"). *Page 15 
 {¶ 64} Appellant's third assignment of error is sustained to the extent indicated.
 IV {¶ 65} Assignment of Error No. 4:
 {¶ 66} "THE TRIAL COURT ERRED WHEN IT ORDERED APPELLANT TO CONTRIBUTE $4,357.50 TO APPELLEE'S ATTORNEY FEES."
 {¶ 67} Appellant argues that the trial court abused its discretion in awarding appellee attorney fees of $4,357.50 because (1) appellee failed to show that he had a financial need for such an award, and (2) the award was inequitable under the facts and circumstances of this case.
 {¶ 68} R.C. 3105.73(A) states in pertinent part:
 {¶ 69} "[A] court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate."
 {¶ 70} The decision to award attorney fees in a divorce action lies within the trial court's sound discretion, and the court's decision will be reversed only if it amounts to an abuse of discretion, i.e., is arbitrary, unconscionable, or unreasonable. See Dunbar v. Dunbar,68 Ohio St.3d 369, 371, 1994-Ohio-509.
 {¶ 71} In this case, the trial court awarded appellee attorney fees after finding that the assets not covered by the parties' antenuptial agreement, i.e., some furniture and household goods, did not require "nearly three days of hearing time." The trial court affirmed this ruling over appellant's objection.
 {¶ 72} Contrary to what appellant contends, the fact that appellee failed to establish a *Page 16 
financial need when he requested attorney fees did not preclude the trial court from awarding them. Former R.C. 3105.18(H) required a party who sought attorney fees in a divorce action to demonstrate that he or she would be prevented from litigating his or her rights and protecting his or her interests if the court did not award reasonable attorney fees.
 {¶ 73} R.C. 3105.73(A), which became effective on April 27, 2005, only requires a showing that an award of such fees would be equitable. Nevertheless, we agree with appellant's assertion that the trial court's decision to award appellee attorney fees in this case was unreasonable and, therefore, an abuse of discretion.
 {¶ 74} It appears that the final hearing did not take "nearly three days" as the magistrate found, but only two days and one-quarter to one-third of another.[4] More importantly, appellee's testimony took almost one-half of that time.
 {¶ 75} The proceedings were delayed on several occasions by appellee's conduct at the hearing. For example, on numerous occasions the magistrate had to tell appellee to raise his voice so that he could be heard. On one of these occasions, the magistrate told appellee, "Mr. Hampton this is the last time I'm going to tell you. * * * [T]he problem is that if you don't speak up, * * * this isn't going to be recorded and everything that you say on the transcript is going to say `inaudible' and that's going to be a huge problem if there are objections filed * * * I'm not going to say it again."
 {¶ 76} The magistrate also had to tell appellee repeatedly not to speak when an objection had been raised. For instance, at one point in the proceedings, the magistrate said, "Mr. Hampton, for at least the fourth time, when somebody says objection that means you stop talking." Later on, the magistrate said to appellee, "Mr. Hampton, * * * why don't you tell me what words I need to say to get you to understand that when there is an objection you *Page 17 
don't get to talk. Because if you want to tell me what those words are I'm happy to say them. Because apparently nothing I've said so far is getting through." Shortly thereafter, the magistrate ordered that a brief recess be taken to allow appellee's counsel to speak to him "about courtroom etiquette and behavior."
 {¶ 77} The evidence showed that both parties breached the term of the antenuptial agreement requiring them to maintain updated lists of their respective assets. The mutual breach of this provision of the antenuptial agreement forced the parties to spend time testifying about whether or not certain assets were marital or separate property.
 {¶ 78} One of the major issues raised at the hearing was whether appellant's efforts in rehabilitating the property at St. Rt. 132 following the April 2001 fire increased the property's value to such an extent that the increase became marital property subject to equal division. While this court has found that there was sufficient competent credible evidence to support the magistrate's determination on this issue, it was nevertheless legitimate for appellant to litigate this issue.
 {¶ 79} It must also be remembered that after finding the parties' antenuptial agreement to be valid, the magistrate informed the parties that the issue of whether there are some assets as to which the agreement should not be enforced would be heard at the final property and merits hearing. A review of appellant's testimony shows that she tried to establish that there were, in fact, assets as to which the agreement should not be enforced, the major one being the increase in value of the property at St. Rt. 132, which she tried to show was the result of her efforts and the expenditure of marital funds.
 {¶ 80} The legitimate issues raised at the final hearing included: how the insurance proceeds received as a result of the April 2001 fire were actually spent; whether appellee destroyed marital assets; the disposition of the 1989 Pontiac, which the magistrate wrongly awarded to appellee; and the disposition of two loan application refund checks, which the *Page 18 
magistrate wrongly failed to award appellant a one-half interest in as to both checks.
 {¶ 81} Under the facts of this case, appellant should not have been penalized for vigorously pursuing her claims against appellee. Imposing fees on appellant in this instance would be tantamount to imposing a "loser pays" rule, which in turn would dissuade litigants like appellant from pursuing legitimate claims they may have against their former spouses.
 {¶ 82} Appellant's fourth assignment of error is sustained.
 V {¶ 83} The trial court's February 2, 2007 Divorce Decree is modified as follows: that portion of the second sentence in the paragraph entitled "Personal Property," which allows appellee to "retain, free from any claim of appellant" the "1989 Pontiac TransAm," is deleted, and replaced with the following language: "appellant shall retain, free from any claim of appellee, the 1989 Pontiac TransAm, subject to any interest that appellant's youngest daughter may have in the vehicle." Also, the section of the decree requiring appellant to pay appellee attorney fees in the total amount of $4,357.50 over a period of 12 months is vacated. As so modified, the trial court's judgment is affirmed.
 {¶ 84} Judgment affirmed as modified.
BRESSLER, P.J., and POWELL, J., concur.
[1] Appellee had two sons and appellant had two daughters from previous marriages.
[2] Both parties made a request for attorney fees and both parties stipulated to the reasonableness of the other's fees, but each party contested whether it was appropriate to award attorney fees to the other. The magistrate denied appellant's request for attorney fees but, as indicated, found that appellee was entitled to such fees.
[3] Civ.R. 53(D)(4)(b) states: "Whether or not objections are timely filed, a court may adopt or reject a magistrate's decision in whole or in part, with or without modification. A court may hear a previously-referred matter, take additional evidence, or return a matter to a magistrate."
[4] The first day of the final hearing produced 168 pages of transcript, the second day produced approximately 200 pages of transcript, and the third day produced less than 50 pages of transcript. *Page 1